121 N.J. Super. 118 (1972)
296 A.2d 317
ARTHUR BALIAN, ET AL., PLAINTIFFS-APPELLANTS,
v.
GENERAL MOTORS, ETC. AND GARY ALLEN CHEVROLET, ETC., DEFENDANTS-RESPONDENTS, AND LOU WEISHUPT, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued April 10, 1972.
Decided June 1, 1972.
Rehearing Denied October 20, 1972.
*120 Mr. Howard M. Kaplan argued the cause for appellants (Mr. Alan R. Kaplan, attorney).
Mr. Carroll A. Morley argued the cause for respondent General Motors Corp. (Messrs. Lamb, Blake, Hutchinson & Dunne, attorneys; Mr. William J. Cleary, on the brief).
Mr. Allen C. Mathias argued the cause for respondent Gary-Allen Chevrolet Company (Messrs. Stevens & Mathias, attorneys; Mr. Frank Fink, of counsel and on the brief).
Before Judges SULLIVAN, LEONARD and CARTON.
*121 The opinion of the court was delivered by CARTON, J.A.D.
This is a product liability case. Plaintiff Louise Balian and other members of her family sustained injuries when a 1965 Chevrolet Impala she was driving on the New York Thruway veered off the side of the road and struck a pole.
There is no real dispute as to the pertinent facts. Plaintiff, Arthur Balian, purchased the 1965 Chevrolet Impala new on December 4, 1964. At various times between that date and the occurrence of the accident the car was serviced by the dealer, who also made repairs and adjustments pursuant to the driver's manual supplied by the manufacturer. Three days before the accident and prior to a planned trip to Montreal, the owner had the automobile's brakes relined, the car tuned up and greased and a tire replaced.
On July 31, 1967 plaintiffs left their home in Teaneck, New Jersey, picked up another passenger in New Milford, drove to Route 17, and then proceeded to the New York State Thruway. Plaintiff, Louise Balian, who had received her New Jersey driver's license about two months before, was driving.
They had traveled about ten miles on the Thruway when the accident occurred. According to plaintiffs' proofs, at that time the car was going about 50-55 miles per hour. The occupants of the car heard a "bang", "clang" or some other noise coming from under the front of the car. It was described as sounding like metal was striking metal. At this point the driver lost her ability to control the car. Despite her attempt to turn the steering wheel and direct the car in another direction, it headed towards the shoulder of the road, striking a metal pole supporting an overhead sign.
Immediately after the accident Trooper McDonnell of the New York State Police arrived on the scene. After questioning plaintiff, he lifted the hood and examined the steering mechanism. His examination revealed that a rivet was missing from the steering coupler and the fibrous wafer separating the two parts of the coupler was torn.
*122 The steering coupler connects two sections of the steering column. It consists of metal flanges located on the ends of the steering column sections which face each other. The flanges are separatd by a fibrous wafer. One of the metal flanges is attached to the wafer by two metal nuts and bolts. The corresponding flange attached to the opposite section of the column is connected to the same wafer by two rivets. The function of the coupler is to hold the two parts of the steering column together while allowing sufficient flexibility to absorb road shock.
Plaintiffs brought this action against defendant General Motors Corporation and others, claiming that the accident resulted from displacement of a rivet in the steering coupler, which in turn tore the fibrous wafer, making the car unsteerable and causing the driver to lose control.
The jury returned a verdict in favor of defendants. We are concerned here only with plaintiffs' appeal from the judgment in favor of defendant General Motors, the manufacturer of the automobile.
The trial, although a lengthy one, was limited as to liability only and devoted largely to technical testimony of expert witnesses concerning the design and function of the coupler and related parts of the automobile steering mechanism, whether it was defectively designed, and whether the defective condition resulted from the accident.
Plaintiffs' expert expressed the opinion that the coupler was improperly designed. Defendant's expert denied this. In the latter's opinion, the damage to the coupler was attributable to the impact of the accident. Furthermore, he contended that the accident could not have happened in the manner indicated by plaintiffs' expert.
The main basis of plaintiffs' appeal is that the trial court, over objection, improperly admitted into evidence motion pictures taken during the course of the trial. These pictures showed the operation of a 1965 Impala in a test at defendant's proving grounds. The film was made at the direction of defendant's expert for the purpose of confirming his contention *123 expressed in his testimony that the automobile was still steerable even if the rivet was missing and the wafer torn. Thus he maintained the accident could not have occurred in the manner described by plaintiff's expert.
Resolution of the issue involved requires a more detailed examination of the expert testimony.
In November 1967, at plaintiffs' request, a Mr. Daniel Fivehouse, an automotive and front-end expert, examined the car. He testified that the rivet described by Trooper McDonnell was missing at that time and that the fibrous wafer was torn. He said that the two parts of the steering coupler were no longer symmetrical. He was of the opinion that when the fibrous wafer was torn and the rivet missing there would be no steering control.
Plaintiffs also produced Huxley Madeheim, an expert in mechanical engineering and in the design and function of the steering coupler. He expressed the opinion that a rivet holding the steering coupler came out, causing the flanges to lose contact and symmetry. The car then became unsteerable, resulting in the driver losing control. It was his opinion that this condition had existed prior to and not as a result of the force of the car striking the pole. This witness, a full professor of engineering at City University of New York, was also of the opinion that the coupler was improperly designed for the reason that it should have been made with four nuts and bolts rather than two nuts and bolts and two rivets, and that had the coupler been so constructed the accident would not have occurred.
Charles Spalding, an expert engineer in the field of steering apparatus and employed in a division of General Motors which manufactures steering gear and other accessories for automobiles, was the only witness called by defendant General Motors. He described in considerable detail the function and operation of the coupler in the automobile, using numerous drawings and designs for this purpose. Defendant also produced for inspection by the court and jury a replica of the steering coupler said to be the type used *124 in 1965 Impalas. The actual coupler involved in the accident was not produced in court.
Spalding expressed the opinion that the coupler which he had helped design was properly designed. He believed that the damage found by Trooper McDonnell and the witness Fivehouse resulted solely from the force of the impact. He stated that such a condition did not cause and could not cause the car to go out of control and that the automobile would be steerable without the missing rivet and with the wafer torn. He also described the first of the two tests conducted at defendant's proving grounds during the course of the trial. He stated that during the test he drove a 1965 Impala under conditions allegedly comparable to those at the time of the accident. He made this test for the purpose of demonstrating the correctness of his contention that notwithstanding the absence of the rivet in the coupler and the existence of the torn fibrous wafer the automobile was steerable. He stated that he was, in fact, able to drive the car without any loss of steering ability. He further testified that motion pictures were taken of this test.
The judge and counsel viewed the movie in chambers. The court ultimately ruled that such motion pictures were inadmissible because defendant had failed to establish that the conditions were comparable. The court then instructed the jury to disregard all testimony concerning the preparation of the experiment and the motion picture taken of it.
This ruling was made while defendant's expert Spalding was still on the witness stand. At the point when the court recessed for the weekend, cross-examination of this witness had been almost completed. Over that weekend Spalding and defendant's trial attorney again went to defendant's proving grounds at Detroit, Michigan and conducted another test of a 1965 Impala. When the court reconvened the following Monday, cross-examination of Spalding was interrupted and he was permitted to describe the second test conducted on the previous Saturday. He repeated his testimony that the automobile was maneuverable although the *125 rivet was missing and the wafer torn. Ruling that defendant had remedied the deficiencies present in the previous test, the court decided that the conditions were comparable. Therefore the court held that the second set of motion pictures could properly be shown to the jury for consideration in determining the issue of defendant's liability. The motion pictures of that test were then exhibited to the jury.
We are confronted here with three evidential concepts: the admissibility of motion pictures; the admissibility of evidence of experiments; and the admissibility of motion pictures of experiments.
It is well settled that relevant motion pictures are generally admissible if properly authenticated. See 62 A.L.R.2d 686, 688 (1958) where the cases are collected. Although no New Jersey case has articulated the basis or requirements for their admissibility, the courts of this State have on numerous occasions permitted their use apparently on the same rationale. For example, in a personal injury case motion pictures depicting a claimant engaged in various physical activities have been received in evidence to show on the one hand the extent of disability and on the other to demonstrate that the injuries are neither permanent nor as extensive as claimed. See 62 A.L.R.2d 686 (1958).
Authentication of motion pictures ordinarily includes (1) evidence as to the circumstances surrounding the taking of the film; (2) the manner and circumstances surrounding the development of the film; (3) evidence in regard to the projection of the film; and (4) testimony by a person present at the time the motion pictures were taken that the pictures accurately depict the events as he saw them when they occurred. See 62 A.L.R.2d 686, 692 (1958).
Here the court made a finding that the film was properly authenticated and although not all the points above mentioned are clearly manifested in the record, technical objections to the film appear to have been waived. Defendant's expert was present in court. The record indicates he was in *126 charge of the making of the film and that he was cross-examined by plaintiffs' counsel concerning the making of the film.
So far as experiments or tests are concerned, admissibility of evidence concerning them would appear to be within the area of judicial discretion and turns on whether the experiment was conducted under conditions and circumstances similar to those actually existing in the case. State v. Harris, 1 N.J. Misc. 526 (Sup. Ct. 1923), aff'd o.b. 100 N.J.L. 184 (E. & A. 1924). See Utz, "Use of Moving Pictures in Out-of-Court Experiments," 8 Defense L.J. 71, 74 (1960), which describes a number of factual situations in which such evidence has been considered. See also Price v. Buckingham Manufacturing Co., Inc., 110 N.J. Super. 462 (App. Div. 1970), where the court held that it was not an abuse of discretion to refuse to admit proof of a simulated reenactment of an accident. The court in this case specifically found that a similarity of conditions and circumstances existed.
The leading case of St. Paul Fire & Marine Ins. Co. v. Baltimore & O.R. Co., 195 N.E. 861 (Ohio Sup. Ct. 1935), which is concerned with motion pictures of experiments, sets out factors which should guide the trial court's discretion in this area. That case has been approved by some commentators. See e.g., Utz, "Use of Moving Pictures in Out-of-Court Experiments," 8 Defense L.J. 71 (1960); 62 A.L.R.2d at 695. The court stated:
* * * Such evidence is usually held competent if there is a substantial similarity between the conditions existing at the time of the occurrence complained of and when the experiments are made. The existence of identical conditions is not necessary; dissimilarity, when not so marked as to confuse and mislead the jury, going to the weight rather than the admissibility of the evidence. In the very nature of things, much must be left to the discretion of the trial judge, and when such discretion has not been abused reviewing courts will not interfere. * * * [at 864]
See also Streit v. Kestel, 161 N.E.2d 409 (Ohio Ct. App. 1959).
*127 We perceive no inherent objection to the admissibility of motion pictures of an experiment. Such evidence, in our opinion, is entirely proper when relevant and its probative value is not offset by undue prejudice, unfair surprise, undue consumption of trial time, or possible confusion of issues due to the introduction of collateral matters. See Rule 4, New Jersey Rules of Evidence. The applicable policy expressed in Rule 4 is well stated in Stoelting v. Hauck, 32 N.J. 87 (1960), where Justice Proctor commented:
There is no doubt that it is generally within the discretion of the trial court to exclude remotely relevant evidence whose probative value is offset by the danger of undue prejudice, unfair surprise, undue consumption of trial time, or the possible confusion of issues attendant on the introduction of collateral matters. * * * [at 103]
The film in question was generally relevant inasmuch as it tended to negate plaintiffs' contention and to support that of defendant. Its relevance was to be tested by its probative value with respect to the points in issue. Miller v. Trans Oil Co., 18 N.J. 407 (1955). Proximate cause was clearly an issue. The testimony of plaintiffs' expert Madeheim tended to establish that a certain defect was the cause of the accident. He testified:
* * * [I]t appears that one rivet came loose which thus put the only contact between one segment of the coupler and the wafer on one rivet. This means under a condition like that that when you attempt to turn the wheel you no longer get 100% cooperation from the coupler. And the net result was that eventually the one remaining rivet tore the lamination which, by the way just for the sake of clarity, they call it a wafer, the laminated material in between the flanges.
Here the degree of relevancy of the motion pictures presents a more difficult problem. There is support in the record for the trial court's finding that the experiment was substantially similar to the actual facts surrounding the accident. That finding does not negate the fact that a motion picture of an artificial reconstruction of an occurrence may *128 be very weak evidence. In this case the motion picture did not portray the actual automobile involved in the accident; nor did it show plaintiffs' actual operation. Indeed, it may be virtually impossible to recreate a particular automobile which has suffered a variety of different and unknown stresses and strains or perhaps enjoyed meticulous care. As Wigmore points out, a movie of such recreation is made up of
* * * a complex series of movements and erections, usually involving several actors, each of them the paid agent of the party and acting under his direction. Hence, its reliability, as identical with the original scene, is decreased and may be minimized to the point of worthlessness. [3 Wigmore, Evidence (Chadbourn rev. 1970), § 798a]
Thus any movie is a manufactured, self-serving piece of evidence. It is true, of course, that all evidence may be said in one sense to be self-serving. However, not all evidence is a staged production whose finale is not only hoped for but very much a part of the script.
Although these considerations do not serve to render this evidence inadmissible, they emphasize the importance of the off-setting factors referred to in Stoelting v. Hauck, supra. We now consider the impact of those factors in this case.
The danger of undue prejudice as a result of the jury's placing inordinate weight on the moving pictures is always present in light of the tremendous dramatic impact of motion pictures. See Paradis, "The Celluloid Witness," 37 U. Colo. L. Rev. 235 (1965). Undeserved emphasis by the jury is also understandable in that presentation of the motion picture is cumulative. The requirement for authentication inevitably adds some degree of cumulative impact on the fact-finder. That impact is considerably increased in this case since the moving pictures were not only concededly designed to lend strength and support to defendant's version of how the accident happened. They were also cumulative to defendant's expert's expressed opinion as to the cause of the accident and his description of the two sets of tests which had been *129 filmed. See Schneiderman v. Strelecki, 107 N.J. Super. 113 (App. Div. 1969), certif. den. 55 N.J. 163 (1969).
Although the procedures attendant upon the presentation of films often involve questions of the allocation of trial time, we do not deem this element of significance in this case.
We also consider that the jury might have been confused by collateral issues presented in the film. The theme of defendant's offer of the proof was that it tended to demonstrate the correctness of defendant's expert's contention that the automobile was operable notwithstanding the loss of the rivet and the existence of a torn wafer. The offer thereby tended to refute the hypothesis expounded by plaintiffs' expert. The film seems to go beyond this. The first sequence showed a 1965 Impala being operated with a rivet missing from a steering coupler and its wafer torn. The third showed a 1965 Impala operating with a steering coupler whose rivet and wafer were missing. The first did not embrace both elements of the alleged defect. The third went beyond the conditions upon which plaintiffs' expert's hypothesis was founded. As such, the motion pictures tended to present collateral issues which might have confused the jury.
The strongest counter-factor militating against the admission of these movies is the element of unfair surprise which was engendered by the manner in which the movies were prepared and presented. Plaintiffs had no prior knowledge of the first experiment or of the motion picture taken of it. It is evident that they had no suspicion that during the weekend, after the results of the first test had been held inadmissible, defendant's expert, along with defendant's lawyer, would journey to defendant's proving grounds in order to repeat the experiment. Plaintiffs can hardly be criticized for assuming that this issue was at rest. One would normally not expect an adversary to be able to present such evidence in an effort to reopen the question, or if able to do so, to proceed with its preparation without apprising his adversaries that such was his intention.
*130 Significantly, in the case at bar plaintiffs procured an order requiring defendants to submit to plaintiffs, within five days of the date set for trial, a copy of their expert's reports. Defendant's position at the trial and here is that the movies were not reports and not therefore covered by the order. Such an interpretation appears extremely narrow. The movie reflected the expert's opinion in refutation of plaintiffs' theory of the case. Plaintiffs apparently made their motion pursuant to R. 4:17-1. This rule allows a party to obtain "* * * a copy of a paper, including the report * * * of any expert * * *." A strict interpretation lends some support to defendant's argument. Nevertheless, we deem it incongruous in the circumstances of this case to permit defendant to avoid the spirit if not the strict letter of the court's order in this fashion. Parenthetically, we note that Rule 1(13) (of the Rules of Evidence treats writing to include every means of recording, including photography. Perhaps plaintiffs' request more properly should have been made under the companion rule, 4:18-1. The rules should probably be clarified in this respect. Since use of motion picture equipment is becoming commonplace, consideration should also be given to the desirability of adopting rules of wider application in discovery and relating to use and admissibility of motion pictures of reconstructed or simulated events such as those involved in the present case.
We are not impressed with defendant's further argument that even if the films were considered experts reports, the order could not literally be complied with because the film was not in existence before the trial, nor with its assertion that it could not make the movie before trial because it was not aware of the precise theory upon which plaintiffs were proceeding until their expert, Madeheim, testified.
These arguments ignore the spirit of the order which was entered just before the trial and place a premium on technicalities. Defendant knew or could readily have known plaintiffs' theory of the accident through available discovery *131 proceedings. Indeed, it is inconceivable to us that in a case of this magnitude defendant would not be fully aware of the basis of plaintiffs' claim.
Defendant knew from the outset that plaintiffs claimed the accident resulted from a malfunction in the steering mechanism. It had in its possession a copy of Trooper McDonnell's report of the accident which contained a statement that the "operator lost control due to malfunction of the steering mechanism." It had also received a copy of the report of plaintiffs' witness Fivehouse in which reference was made to the steering coupler. With such knowledge we see no reason why it could not have prepared the movie before trial and offered plaintiffs an opportunity to see it. By waiting until the eleventh hour it was thus able to prepare the movie without the knowledge of its adversaries and without giving them any opportunity to prepare a rebuttal. We cannot sanction such trial tactics, more reminiscent of the days before the present liberal discovery rules.
A motion picture in the eyes of the jury is one of most spectacular forms of evidence. It is cumulative in nature. There are inherent dangers in its preparation and presentation. Effective rebuttal can only be had if opposing counsel and his expert are given an adequate opportunity to meet such evidence. We do not consider that cross-examination alone would ordinarily provide a sufficient avenue of rebuttal to the adverse party. Consequently, as a prerequisite to the admission into evidence of motion pictures of a reconstructed event or a posed demonstration taken during the pendency of an action, fundamental fairness dictates that the party proposing to offer such evidence give notice thereof and an opportunity to his adversary to monitor the experiment and the taking of the film.
This is especially true in this case. Even if it be assumed that emergency preparation during the course of the trial was unavoidable, plaintiffs should have been given notice and an opportunity for their expert to monitor the preparation of the movie. Viewing the movie on the following trial day *132 hardly provided a sufficient opportunity to prepare a rebuttal. See Paradis, "The Celluloid Witness," 37 U. Colo. L. Rev. 235, 251 (1965); Gulf Life Ins. Co. v. Stossel, 131 Fla. 268, 175 So. 804 (Sup. Ct. 1937), mod. 131 Fla. 127, 179 So. 163 (Sup. Ct. 1938). In this case defendant significantly gave no notice to plaintiffs of its intention to conduct the first experiment and to take moving pictures of it, nor of its subsequent plan to conduct another test in order to remedy deficiencies in the first one and to exhibit motion pictures of that test in conjunction with Spalding's already completed direct testimony.
In light of all the circumstances, we conclude that the motion pictures should have been excluded from exhibition to the jury and from admission into evidence, and that the failure to do so requires a reversal. In the event of any retrial of this case, the admissibility of any motion pictures of experiments should be determined in accordance with the principles expressed in this opinion.
The judgment in favor of defendant General Motors Corporation and against plaintiffs is reversed. The judgment in favor of Gary Allen Chevrolet is affirmed since on oral argument plaintiffs abandoned any claim against that defendant.

ON PETITION FOR REHEARING
PER CURIAM.
After the entry on June 1, 1972 of the judgment of this court, defendant General Motors Corporation submitted a petition supported by affidavits for a rehearing and recall of the judgment. Defendant claims that there was no factual support for the Appellate Division's conclusion that General Motors neither gave plaintiffs notice of its intention to conduct an experiment nor an opportunity to monitor the filming thereof.
The asserted basis of this application was that on January 30, 1970 defendant's counsel had in fact "irrevocably indicated to all concerned his intention to once again film the experiment * * * in order to cure the deficiencies found by *133 the court to exist in the first film," and in fact had "invited plaintiff's counsel to observe the conduct and film of these tests." These statements were allegedly made after the trial court had ruled the first films inadmissible.
We observe that defendant had not at any time previously advanced any contention of this nature. Defendant's initial position was basically that a notification of the tests and an opportunity to monitor the filming of the tests were not prerequisites to the film's admission into evidence.
The attorney who originally represented defendant died after the trial. The attorney appearing for defendant on the appeal indicated that he did not become aware of the circumstances giving rise to this aspect of the appeal until after the decision was handed down by this court.
In view of this unusual development, we directed plaintiffs' counsel to file answering affidavits and agreed to hear further oral argument. We thereafter remanded the matter to the trial court to make a factual determination on this issue. The judge who presided over the original trial disqualified himself because of the possibility he might be called as a witness. The matter was then assigned to another judge who conducted a hearing. Seven witnesses, including the trial judge, testified.
The remand judge made extensive written findings of fact. He noted, as we have done, that the trial transcript revealed no relevant conversations made in open court or in chambers. He went on to indicate that certain conversations related by defendant's witnesses had taken place on January 30, 1970 in the court's chambers and in the courtroom later that day. However, the remand judge remarked that:
It is another question as to whether or not Mr. Glaser and Mr. Kaplan [plaintiffs' trial attorneys] were parties to these conversations, heard the conversations, and understood that they were genuine offers affording them an opportunity to be present in Detroit for the filming of the second experiment. *134 The judge noted that the trial judge had no recollection of any such offer being made in his chambers or in open court. Additionally, he found specifically that the trial judge was not a party to any conversations in chambers where an offer was made to plaintiffs' counsel to come to Detroit for the purpose of observing the experiment. Furthermore, the trial judge testified that be believed no such offer had been made. The remand judge concluded that, although some conversations took place, he was unable to find that an understanding was arrived at by the respective counsel which would indicate that defendant's counsel had "informed plaintiffs of his intention to conduct a certain experiment and to take motion pictures thereof for the purpose of introducing said films into evidence." He added: "Nor can I find that defendant, General Motors, afforded plaintiffs an opportunity to monitor such experiment and the making of the film."
We have carefully reviewed the evidence taken on the remand and the findings and conclusions of the court thereon. We are satisfied that they are fully supported by the record. We are not persuaded by defendant's argument that the court's conclusions are against the weight of the evidence or inconsistent with its findings.
We have considered the additional points raised by defendant and we preceive no reversible error in any of them.
Petition for rehearing and recall of judgment denied.