JOYCE P. JENKINS, PLAINTIFF-APPELLANT, AND MARY
BETH HULL, BY HER GUARDIAN *AD LITEM* DOUGLAS
E. HULL, AND DOUGLAS E. HULL, INDIVIDUALLY,
PLAINTIFFS, v. JOSEPH H. RAINNER AND RUTHIG
TRANSPORTATION CORPORATION, DEFENDANTS-RE-
SPONDENTS, AND GEORGE F. WEAVER, SAFETY BUS
SERVICE, RUTH J. LOWE, AND RAPHAEL J. MARINI,
DIRECTOR OF MOTOR VEHICLES OF THE STATE OF
NEW JERSEY, DEFENDANTS.

Argued April 14, 1975—Decided January 13, 1976.

*Mr. Henry L. Hewitt* argued the cause for plaintiff-appellant (*Messrs. Weinberg and Fishman,* attorneys).

*Mr. James A. Mullen, Jr.,* argued the cause for defendants-respondents (*Messrs Kisselman, Deighan, Montano & Summers,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J. In preparation for trial of this action seeking recovery for personal injuries arising out of a vehicular accident, defendants-respondents' liability insurer placed plaintiff-appellant under surveillance and took motion pictures of her. The question presented here is whether on plaintiff's demand defendants must present a print of each film for examination and disclose the circumstances under which the movies were taken. The trial court concluded that they need not. The Appellate Division denied leave to appeal, but on plaintiff's application leave was granted by this Court. We now reverse.

I

On June 16, 1970 plaintiff Joyce P. Jenkins was a passenger in a bus which collided with a vehicle owned by defendant Ruthig Transportation Corporation and driven by its agent, defendant Rainner. In the course of discovery in

her action against all owners and operators allegedly involved, Mrs. Jenkins gave an oral deposition on October 4, 1972. She therein testified as to the nature and extent of her injuries and treatment as well as her existing disability and complaints.

Thereafter, on August 14, 1974, plaintiff's attorneys took the deposition on oral examination of one Allen Waldman, a private investigator whose name as a witness had been supplied to them through defendants' answers to interrogatories. Waldman testified that in January, 1973, some three months after plaintiff's deposition, he received an assignment from a representative of Home Insurance Company, liability carrier for defendants. Incident to that assignment Waldman conducted a surveillance of Mrs. Jenkins and took motion pictures of her. Additionally, he had his employee Louis Talarico "speak to other persons" about Mrs. Jenkins' physical condition and furnish a report on the results of the interviews. While Waldman was permitted to testify freely as to the type of camera used, the kind of lenses available and the range of apertures, he was instructed by defendants' attorney not to answer any inquiry respecting where, when, how often and under what circumstances the movies were taken, nor was he permitted to testify as to when the investigation of Mrs. Jenkins began and ended or to supply the names of the people to whom Talarico spoke. The basis for the attorney's position as stated at the deposition was that

\* \* \* in actuality Mr. Waldman was hired to perform his services for our client, being insured by Home Insurance Company, and it was his work, and when and where and how he did that work is part of the work product of our preparation of this case for suit for defense.

Likewise, a demand of Waldman by plaintiff's attorneys to see Talarico's report was rejected, defendants' attorney stating that the report was a "confidential communication between our investigator and our office."

Plaintiff thereupon applied for an order (a) requiring defendants to produce photographs and moving pictures of Mrs. Jenkins, (b) compelling Waldman to answer all questions propounded of him at the depositions, and (c) requiring defendants to produce and allow inspection of the "expert's report of Mr. Talarico." After hearing argument and examining the record the trial court denied the relief sought in all respects.

■ As to Talarico's report, the briefs before us do not touch upon it. Given the present unilluminating record, particularly the absence of any indication that Talarico is in fact an expert, and the conspicuous avoidance of any argument on the report in the proceedings before us, we deem the point to have been waived. Suffice it to say that if the people Talarico interviewed have knowledge of relevant facts, their identity and location must be disclosed to plaintiff. R. 4:10–2(a). With respect to the films and the questions of Waldman, however, we think the trial court erred.

## II

The relevancy of the films is acknowledged by defendants; for purposes of the argument we can assume they purport to portray plaintiff engaged in some physical activity inconsistent with her claims of disability. However, their disclosure is resisted on the ground that they were prepared for trial at the direction of defense counsel and thus are cloaked with absolute immunity from discovery as "work product"; and further that even if invasion of the defense file be permitted under our rules of discovery, plaintiff has not demonstrated either her "substantial need" for these movies or her inability without undue hardship to obtain their substantial equivalent by other means, as required by R. 4:10–2(c).

## –A–

■ Much of what was traditionally included as non-discoverable "work product" has in recent years been stripped

of its absolute protection. See *Pressler, Current N. J. Court Rules, Comment R.* 4:10–2. See also "Developments in the Law—Discovery," 74 *Harv. L. Rev.* 940, 1027–1046 (1961). So it is that now one is hard put to conceive of any non-privileged relevant material which enjoys an unqualified protection against discovery, that favored status of absolute immunity being reserved for "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." See *Pressler, Current N. J. Court Rules, Comment R.* 4:10–2. While re-affirming the sacrosant character of whatever may be included in these latter categories, we hold as well that if the industry of counsel or his investigator results in a piece of concrete evidence, such as the motion picture films in this case, then that evidence is not rendered non-discoverable *solely* because of the "work product" doctrine. If it be non-discoverable despite its relevancy and the absence of privilege, it must be by reason of some exception provided for by our discovery Rules.

–B–

By its terms *R.* 4:10–2(c) permits a party, subject to certain conditions, to obtain discovery of non-privileged relevant documents and tangible things even though they were prepared by the adversary for trial, but "only upon a showing that the party seeking discovery has *substantial need* of the materials in preparation of his case and that he is unable without *undue hardship* to obtain the substantial equivalent of the materials by other means" (emphasis supplied). Here the trial judge denied the application because he perceived no substantial need for plaintiff to view the movies; and inasmuch as she or her counsel could not see the films, he saw no benefit to them in the "information relating to the details of the movies" as sought by the interrogation of Waldman.

Defendants argue that plaintiff has no "substantial need" to view the surveillance movies because she better than any-

one else knows the truth of her physical condition at the time the pictures were taken, and consequently her purpose in seeking discovery is not to learn facts of which she would otherwise be ignorant but rather to prepare herself in advance of trial against the damaging impact of impeachment evidence. This was substantially the position taken by the court in *Margeson v. Boston & Me. R. R.,* 16 *F. R. D.* 200 (D. Mass. 1954), on a motion to require production of documents, as follows:

The adoption of the Civil Procedure Rules was not a denial of the concept that the court is the forum and the trial the procedure best calculated to uncover the truth. The enthusiasm which greeted the discovery provisions of the Rules when carried, as it has been, to the extent here advocated, that "the truth should be known before the trial, and nobody be surprised", seems calculated, however, to weaken the efficacy of ordinary trial procedure. There is a vast difference between surprise and unfair surprise. The one is as beneficial as the other is harmful. Not merely may too many rehearsals, in the form of too much discovery, take the bloom off the opening night, but this absence of freshness may make the performance sterile. A certain amount of surprise is often the catalyst which precipitates the truth. Alternatively it may serve as a medium by which the court or jury may gauge the accuracy of the account.

If every witness consistently told the truth, and none cut his cloth to the wind, little possible harm and much good might come from maximum pretrial disclosure. Experience indicates, however, that there are facile witnesses whose interest in "knowing the truth before trial" is prompted primarily by a desire to find the most plausible way to defeat the truth. [*Id.* at 201.]

■ This approach, however, is not without its infirmities. As a matter of history it runs counter to this State's accommodation of competing policy considerations in this area, articulated by Dean McCormick in terms of the extent to which "the interest in privacy of preparation [has] been submerged by the tide flowing toward a wider scope of discovery." *McCormick, Evidence,* § 96 at 202 (2d ed. 1972). Our court system has long been committed to the view that essential justice is better achieved when there has been full disclosure so that the parties are conversant with all the available facts. See, *e. g., In re Selser,* 15 *N. J.* 393, 405

(1954). Twenty-five years ago Chief Justice Vanderbilt pointed out:

Our Rules for discovery * * * are designed to insure that the outcome of litigation in this State shall depend on its merits in the light of all of the available facts, rather than on the craftiness of the parties or the guile of their counsel. [*Lang v. Morgan's Home Equip. Corp.*, 6 *N. J.* 333, 338 (1951).]

This policy is in keeping with the modern trend which recognizes "the need to make available to each party the widest possible sources of proof as early as may be so as to avoid surprise and facilitate preparation." *McCormick, op. cit. supra*, § 96 at 202.

Quite aside from its departure from this long-established policy, defendants' position suffers from an obvious analytical weakness: it is based on the premise that defendants' evidence (in the form of the undercover films) is the exclusive repository of truth and virtue and its disclosure prior to trial will deprive them of the opportunity to demonstrate to the jurors the fraud plaintiff seeks to work upon them. While defendants do not state that assumption quite so bluntly, their argument rests upon it at least implicitly. The premise is one we can hardly indulge. It is no more unlikely that a defendant may resort to chicanery in fabricating motion pictures of one alleged to be the plaintiff than it is that a plaintiff may indeed be a faker. The camera itself may be an instrument of deception, capable of being misused with respect to distances, lighting, camera angles, speed, editing and splicing, and chronology. Hence, "that which purports to be a means to reach the truth may be distorted, misleading, and false." *Snead v. Amer. Export-Isbrandtsen Lines, Inc.*, 59 *F. R. D.* 148, 150 (E. D. Pa. 1973).

The surprise which results from distortion of misidentification is plainly unfair. If it is unleashed at the time of trial, the opportunity for an adversary to protect against its damaging inference by attacking the integrity of the film and developing counter-evidence is gone or at least

greatly diminished. The delay which would inevitably ensue from an interruption of the trial to permit examination and perhaps testing of the films should be avoided. If on the other hand the motion pictures actually portray plaintiff engaged in some strenuous activity which on deposition she had already testified is beyond her capacity, then it is not probable that pretrial disclosure of that kind of inconsistency will enable her to salvage the case; more likely it will hasten a settlement. If the inconsistency is not glaring or is susceptible of explanation, or if for other reasons settlement opportunities are not enhanced, then the adversarial system will be called upon to work, but now in the environment in which it works most efficiently — where the parties are aware of all the evidence. See *Martin v. Long Island R. R. Co.,* 63 *F. R. D.* 53, 54 (E. D. N. Y. 1974). We conclude that all these considerations establish "substantial need" for plaintiff to see the motion pictures in question.

We turn to the provision of *R.* 4:10–2(c) that the party seeking discovery must be "unable without undue hardship to obtain the substantial equivalent of the materials by other means." Plaintiff contends this requirement is met by the impossibility of creating the equivalent of the motion pictures, they having been taken sometime in the eighteen month period prior to Waldman's deposition.

The point does not require much exposition. If the evidence is unique, such that a party cannot copy or otherwise recreate it, then the hardship in obtaining a substantial equivalent seems manifest. Defendants do not offer any suggestion as to what steps plaintiff might now take to reproduce the evidence contained in their motion pictures. The likelihood of any substitute, were we able to think of one, being the substantial equivalent of the films is slim indeed, given the tremendous impact of movies. See *Balian v. General Motors,* 121 *N. J. Super.* 118, 128 (App. Div. 1972); Paradis, "The Celluloid Witness," 37 *U. Colo. L. Rev.* 235. Plaintiff herein has satisfied the requirement of the Rule.

## III

The second part of plaintiff's application to the trial court was for an order compelling the investigator for defendants' insurance carrier "to answer all questions propounded of him at the depositions." Neither below nor here have the specific questions been considered individually, nor have we been presented with argument as to why any particular inquiry should be permitted or disallowed.

We therefore treat the application as one generally seeking production of information regarding the circumstances of the filming. From what we have already decided with respect to the films themselves, it follows that the investigator must respond to those questions directed to the time or times the movies were taken, how long the surveillance continued, what plaintiff was doing, who was present, how many reels of film resulted, who presently has possession of the films, and the like.

## IV

We have thus far considered a party's right to discovery of the films and the manner of their production without regard to any reciprocal right of the adversary to conduct further interrogation after the movies have been taken. While that question has not been raised or discussed by the parties hereto, we nevertheless deem it appropriate to advert to the point as a matter of guidance in the handling of similar discovery motions.

In this case the issue of discoverability of surveillance motion pictures comes to us with a time sequence in which the films were taken after plaintiff had already testified. While we have assumed that there is an inherent inconsistency between plaintiffs' claims on depositions and what the pictures reveal, such inconsistency may not in fact show itself in every situation where the depositions come first — that is, there may be a gap or lack of parallelism between what a party testified to and what he may be shown to have done at

a later date, either because of developments during the time lag or because the interrogator's attention was not caused to be focused on the particular type of conduct or activity later depicted in the films. Considerations of both simple fairness and full discovery for both sides require that the opportunity be afforded to fill in that gap by interrogation directed to the specific activities filmed. In this case, then, the defendants, in consideration of their making the films available to plaintiff, should be allowed first to take plaintiff's deposition again, limited to the issue of damages, and on such terms as the trial judge may impose to reflect whatever inconvenience may be sustained by plaintiff being recalled.

As a general proposition, and always subject to the discretion of the trial court, any demand for surveillance motion pictures should be accompanied by a consent to be deposed *after* the movies have been taken and *before* the films must be presented for the adversary's examination. We recognize that there may be circumstances which would compel deviation from this general rule, but we are confident that a trial judge's discretion is a sufficient source of protection when the particular circumstances are presented.

V

The order of the Law Division is reversed and the cause remanded to that court for entry there of an order, consistent with this opinion, providing for discovery of the surveillance motion pictures and examination on oral deposition of the witness Waldman, both conditioned on defendants having the opportunity further to depose plaintiff. No costs.

*For reversal and remandment*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For affirmance*—None.