268 N.J. Super. 235 (1993)
633 A.2d 544
JOSZEF KISS AND EDITH KISS, PLAINTIFFS-APPELLANTS/CROSS-RESPONDENTS,
v.
ZIV JACOB,[1] DEFENDANT-RESPONDENT/CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 12, 1993.
Decided November 5, 1993.
*237 Before PETRELLA, BAIME and VILLANUEVA.
David L. Ploshnick, argued the cause for appellants/cross-respondents (Baer, Arbeiter & Ploshnick, attorneys; Mr. Ploshnick, on the brief).
John G. Tinker, Jr., argued the cause for respondent/cross-appellant (Leary, Bride, Tinker & Moran, attorneys; Mr. Tinker, on the letter brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D.
On January 13, 1988, Joszef Kiss ("plaintiff"), was the owner and operator of a motor vehicle which was stopped on Route # 18 in East Brunswick, New Jersey, behind three other vehicles when struck in the rear by a motor vehicle operated by Ziv Jacob ("defendant") and owned by his wife, Elvira Yakov. Behind the Jacob vehicle and involved in an impact with the Jacob vehicle prior to the impact between the Jacob and Kiss vehicles were automobiles of the defendants, Warnebold and Marold. Plaintiffs[2] *238 instituted suit against the operators of the three succeeding vehicles. A third party complaint was later filed against the operators of the three vehicles, Palacios, Patel, and Agaba which were proceeding in front of the Kiss vehicle. Plaintiffs' complaint was also amended to name the operators of these three vehicles. Defendants Marold, Patel, Agaba, and Palacios successfully moved for summary judgment to dismiss the claims against them.
Immediately prior to trial, plaintiffs settled with defendant Warnebold for her $100,000 insurance policy. At a liability trial against defendant Jacob, the issue of the alleged negligence of both Jacob and Warnebold was submitted to the jury. The jury concluded that Warnebold was negligent, but that her negligence was not a proximate cause of the accident which caused plaintiff's injury. The jury found Jacob 100% at fault for the accident.
Early in the course of discovery, plaintiffs served interrogatories on Jacob's attorney. Interrogatory # 35 requested information whether photographs existed relevant to this case. Initially, Jacob's response was "no." Thereafter, in October and November 1991, representatives of Jacob obtained photographs and videotapes depicting plaintiff engaging in certain activities. By letter of November 22, 1991, Jacob amended his interrogatories to update his answers, including supplemental answers to the questions dealing with, among other matters, any persons with relevant knowledge and photographs. As part of that amendment, Jacob supplied the names and addresses of three individuals (employees of Interprobe, Inc., who had been involved in surveillance of the plaintiff). Interrogatory # 35, dealing with photographs, read as follows:
Do you or does anyone on your behalf have any photographs of the scene of the accident or the persons involved or of any object involved? If so, state: (a) name and address of person taking such photographs; (b) date photographs were taken; (c) name and address of the person, firm or corporation in whose possession the photographs are at the present time; and (d) description of what each photograph shows.
*239 The supplemental response supplied in the November 22, 1991 letter stated:
Photographs of the vehicles involved in the accident, defendant Warnebold's vehicle, and plaintiff are in the possession of defendant Jacob's attorney, and on information and belief, additional photographs are contained in the file of the attorney of the defendant Warnebold. The photographs were taken at various times after the accident. All photographs are available for inspection in the offices of defendant Jacob's attorney or defendant Warnebold's attorney on reasonable notice.
For five months between November 22, 1991, and the date of the trial on damages, plaintiffs' attorney never made any request to see the "photographs," nor did he make any inquiry as to the nature of the knowledge possessed by the persons named with relevant knowledge who took the photographs and videotapes. Interrogatory # 35 was the only interrogatory served by plaintiff which, arguably, asked Jacob to provide any information related to photographs. No interrogatory, or other discovery request, made specific reference to videotapes.
After the plaintiffs presented their proofs in the trial on damages, Jacob offered into evidence the testimony of two of the photographers and videographers who took photographs and videotapes of the plaintiff, Joszef Kiss. Plaintiffs' attorney objected to the testimony of these individuals as well as the introduction into evidence of approximately sixty photographs (marked as a package) and the videotapes, but the trial judge permitted this evidence. The judge ruled that the letter dated November 22, 1991, specifically alerted plaintiffs' attorney to the fact that photographs and/or videotapes of the plaintiff, Joszef Kiss were in the possession of the attorneys for Jacob.
The jury rendered a verdict in favor of both plaintiffs, against Jacob in the aggregate of $45,000. Joszef Kiss was awarded $37,500 for lost earnings and $5,000 for his injuries. Edith Kiss was awarded $2,500 for her per quod claim. Following the jury's verdict, Jacob moved to reduce the award based upon personal injury protection ("PIP") benefits received by Joszef Kiss and *240 collateral source set-offs. The judge reduced plaintiffs' award to $11,500 (the net lost income claim) plus pre-judgment interest of $3,102.29. Plaintiffs then moved for a new trial and/or an additur, which was denied.
Upon appeal, plaintiffs have elected not to order a transcript of the motion for a new trial, nor of any of the trial testimony by plaintiffs, their doctors and other witnesses. Plaintiffs do not appeal from that aspect of the order denying a new trial, but appeal only with respect to the order molding the verdict, and with respect to the trial court's decision to allow the jury to hear the testimony of the surveillance witnesses and to view the photographs and videotapes. Defendant Jacob cross-appeals from that part of the order molding the jury verdict which allowed some of the lost income award to stand despite N.J.S.A. 2A:15-97.

 I 
Both plaintiffs' depositions were taken originally on September 6, 1989. At the request of defendant Jacob, plaintiff's activities on October 23, 24, and 25, and November 8 and 20, 1991, were videotaped by Robert Andrews and Robert Higgins of Interprobe, Inc. By letter of November 6, 1991, in preparation for the upcoming damages trial, Jacob's attorney requested that plaintiffs be produced for re-deposition regarding developments since their first deposition. That re-deposition took place on November 20, 1991. By letter of November 22, 1991, Jacob amended his interrogatories to include Higgins and Andrews as witnesses and to amend his answer to # 35 advising plaintiffs that photographs existed of defendant Warnebold's vehicle and plaintiff.
The genesis of a party's obligation to provide discovery to his adversary inheres not in any general obligation to expose the defenses available to a client, but rather in the Court Rules and *241 decisional law interpreting the rules applicable to discovery. An attorney's primary obligation to his client is to provide the best defense possible within the framework of the law. This is particularly so in this case, where plaintiff alleged an injury and damages claim[3] which, if accepted by the jury, would have resulted in a jury verdict exceeding Jacob's insurance coverage.
No rule requires a party to provide discovery unless requested to do so. R. 4:10-1 provides discovery methods by which one party can obtain information from another party in the form of "[d]epositions ...; written interrogatories; production of documents or things; ... and requests for admissions." Each rule is activated by a request by one party to another to provide discovery. Absent a request, no obligation exists to provide any information to an adversary. Absent a request for expert reports or a written interrogatory requesting information about experts, a party at trial may call any expert who can qualify and whose testimony is relevant to an issue in the case.
Plaintiffs' argument in opposition to the admission of the videotapes at the trial was two-fold: 1) the answers to interrogatories were amended only to reflect the existence of photographs, not videotapes; and 2) plaintiff was unfairly surprised by the existence of videotapes which Jacob was obligated to provide in discovery. In addition, plaintiffs' attorney says that he misunderstood the answer to mean photographs of "plaintiff's vehicle" and not of "plaintiff" and, in any event Jacob's attorney should have "volunteered" that he was in possession of videotapes.
*242 The trial court dealt with the first argument by indicating that two possible definitions existed: (1) the word "photographs" includes all forms of photographs, including videotapes, or (2) videotapes are separate and distinct from "photographs." The trial court properly reasoned that if "photographs" includes videotapes, the plaintiff was advised by Jacob's November 22, 1991 letter, that "photographs" (in the general sense) existed. The answer incorporated the term used by plaintiffs in the interrogatory.
Likewise, if "photographs" is considered a specific word excluding, by definition, "videotapes," Jacob had no obligation to advise plaintiffs' attorney of the existence of that for which he did not ask. Neither Balian v. General Motors, 121 N.J. Super. 118, 296 A.2d 317 (App.Div. 1972), certif. denied, 62 N.J. 195, 299 A.2d 729 (1973), nor Jenkins v. Rainner, 69 N.J. 50, 350 A.2d 473 (1976), requires a contrary result.
Plaintiffs place particular reliance on Jenkins, wherein the defendant, notwithstanding a discovery request, refused to allow plaintiff's attorney before trial to see movies and question the investigator who took the movies for information regarding the circumstances of the filming. Id. at 52-53, 350 A.2d 473. Defendant argued that the films were protected as "work product" and plaintiff had not demonstrated either her "substantial need" for these movies or her inability without undue hardship to obtain their substantial equivalent by other means, as required by R. 4:10-2(c). Id. at 54, 350 A.2d 473. The Supreme Court granted leave to appeal and disagreed, holding that the films were discoverable under R. 4:10-2. Id. at 54-58, 350 A.2d 473. Those facts are clearly distinguishable from the facts herein. The existence of "photographs" (the only question asked) was disclosed to plaintiffs' attorney, but he made no request to see the photographs or to obtain additional information as to the subject matter of the photographs, nor did he inquire regarding the information the new witnesses possessed.
In Balian, notwithstanding plaintiffs' procuring an order requiring defendants to submit to plaintiffs a copy of their expert's *243 reports, defendants failed to disclose motion pictures of a reconstructed event or a posed demonstration, which the trial court permitted in evidence. Balian, supra, 121 N.J. Super. at 122, 130, 296 A.2d 317. We held that this was reversible error. Id. at 132, 296 A.2d 317. Here, however, there was no request for experts' reports or videotapes, nor was there a reconstructed event or posed demonstration.
Herein, Jacob's amendment to answers to interrogatories was specific in advising plaintiffs of the existence of photographs taken of plaintiff. Jacob fairly apprised plaintiffs of the information requested, and as such complied with his obligation to provide discovery. Had plaintiffs' attorney requested the opportunity to view the photographs, the opportunity would have been afforded; had he inquired, and/or viewed the photographs, any request to see videotapes would have been honored or the court would have so ordered. As the trial judge properly noted several times, plaintiffs' claim of unfair surprise has no merit. If there was surprise, it was not caused by any improper action by Jacob. Furthermore, had the videotapes been excluded, Higgins and Andrews would nevertheless have been permitted to introduce the sixty photographs and to testify concerning their observations of: (1) plaintiff's rental and operation of a standard transmission truck which he allegedly could not drive, for deliveries to New York; (2) plaintiff's participation in the loading and unloading of heavy furniture, televisions, and mattresses at the New York delivery site; and (3) plaintiff's operation of the loaded truck enroute to a second location where he unloaded it and then drove it back to New Jersey. If the court had excluded the videotapes because plaintiffs did not follow up on the amended answers to interrogatories, it would have excluded relevant evidence to Jacob's prejudice, but still would not have prevented the jury from hearing testimony about plaintiff's activities. Plaintiff conceded at trial that he was the individual depicted in the photographs and videotapes. He was not recalled as a witness to give any explanation of how the videotapes could be reconciled with his trial and deposition testimony, nor did plaintiff claim that the videotapes, photographs, *244 or the testimony of investigators misrepresented or distorted facts or misled the jury.
On appeal, plaintiffs do not challenge the reasonableness of the jury verdict based on the evidence adduced at trial. Plaintiffs decided not to appeal the denial of their motion for a new trial based upon the "contrary to the weight of the evidence" argument. The judge noted in the Ev.R. 8(1) (now N.J.R.E. 104(a)) hearing that he recalled the plaintiff "testifying substantially that he really hasn't done any heavy work since the day of the accident ... [and] that he just can't use his right arm anymore." After viewing the videotapes, the judge stated: "I had assumed that, you know, you were going to show me a video where he is lifting drums with his right hand. I am not sure after I see that individual whether it realty (sic) helps the defendant that much, but nevertheless the jury is going to have to make that determination." We cannot even determine whether plaintiffs suffered any prejudice as a result of the introduction of the videotapes because plaintiffs' attorney ordered only a partial transcript and has, therefore, waived any argument which depends, in whole or in part, on an analysis of the evidence necessary to determine if any trial ruling constituted reversible error.

 II 
Plaintiff Joszef Kiss concedes that the court properly reduced his award for lost income from $37,500 to $11,500 because he had received lost income benefits of $26,000 (the policy limits from his PIP carrier). However, plaintiffs argue that the collateral source rule, N.J.S.A. 2A:15-97, should not have been applied to eliminate the award of $5,000 for plaintiff Joszef Kiss' injury and his wife's per quod award of $2,500. Whereas, defendant Jacob on his cross-appeal contends that N.J.S.A. 2A:15-97 requires that the entire lost income award be offset by the collateral source payment of $100,000.
*245 The damages award in favor of plaintiffs included $7,500 for pain and suffering and disability, and $11,500 for net lost income, after reduction for PIP benefits received.
N.J.S.A. 2A:15-97 provides:
In any civil action brought for personal injury or death, except actions brought pursuant to the provisions of P.L. 1972, c. 70 (C. 39:6A-1 et seq.), if a plaintiff receives or is entitled to receive benefits for the injuries allegedly incurred from any other source other than a joint tortfeasor, the benefits, other than workers' compensation benefits or the proceeds from a life insurance policy, shall be disclosed to the court and the amount thereof which duplicates any benefit contained in the award shall be deducted from any award recovered by the plaintiff, less any premium paid to an insurer directly by the plaintiff or by any member of the plaintiff's family on behalf of the plaintiff for the policy period during which the benefits are payable. Any party to the action shall be permitted to introduce evidence regarding any of the matters described in this act.
[L. 1987, c. 326, § 1.]
N.J.S.A. 2A:15-97 modifies the common law collateral source rule for causes of action arising on or after December 18, 1987, such as this one, and applies to benefits received "from any other source other than a joint tortfeasor." Plaintiffs acknowledge that because the accident happened after the statute was adopted they came under this legislative restriction, but they contend that it is incomprehensible that the Legislature intended that N.J.S.A. 2A:15-97 would apply to a settlement received from a non-tortfeasor. Rather, they contend that the rationale found in Rogers v. Spady, 147 N.J. Super. 274, 371 A.2d 285 (App.Div. 1977)[4], should be followed.
A joint tortfeasor refers to "two or more persons jointly or severally liable in tort for the same injury to person or property." Black's Law Dictionary 839 (6th ed. 1990). For the purpose of the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -20, *246 the term "joint tortfeasors" means "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." N.J.S.A. 2A:53A-1; see also Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 566, 410 A.2d 674 (1980). To be a joint tortfeasor one must be liable in tort. Warnebold was clearly not a joint tortfeasor, even though she was an alleged joint tortfeasor.
The Legislature knew the difference between an "alleged tortfeasor" and a "tortfeasor" because it eliminated the words "alleged tortfeasor" in amending a statute adopted the same day as N.J.S.A. 2A:15-97. See L. 1987, c. 324. In fact, in amending N.J.S.A. 59:9-3, the Legislature did not enact that portion of the proposed bill which would have continued referring to "alleged tortfeasor."
The Legislature is familiar with the meaning of "other than a joint tortfeasor" because it used those words in 1972 when N.J.S.A. 59:9-2(e) was adopted, and the words were interpreted by us in Ayers v. Jackson Tp., 202 N.J. Super. 106, 126-27, 493 A.2d 1314 (App.Div. 1985), aff'd, 106 N.J. 557, 612, 525 A.2d 287 (1987). See also Murray v. Nicol, 224 N.J. Super. 303, 540 A.2d 239 (App.Div. 1988). The purpose of that statute, like N.J.S.A. 2A:15-97, "is to prohibit the receipt of duplicate benefits by a claimant...." Id. 202 N.J. Super. at 126, 493 A.2d 1314 (quoting Comment, N.J.S.A. 59:9-2).
The overriding legislative intent of the Legislature in adopting N.J.S.A. 2A:15-97 was to prevent a claimant from receiving benefits beyond the damages awarded under a judgment entered and to relieve defendants and insurance companies from having to compensate plaintiffs for damages in excess of the total amounts of their losses. The economic impact of the collateral source rule is substantial and certainly, in part, has led to spiralling insurance costs for not only commercial enterprises but also the consuming public. Plaintiffs are not generally compensated by the perpetrator of the incident but rather by the insurance *247 system itself. In other words, all insureds, not just the defendant, become responsible. The News Release by Governor Thomas H. Kean of December 18, 1987, indicated that the Governor "signed three bills reforming the State's liability insurance laws by protecting municipalities from paying an unfair share of damages in a liability suit, modifying the so-called `deep pockets' rule in civil litigation which allowed persons to be forced to pay a much larger share of damages than they were responsible for, and reducing the possibility of `double recoveries' in civil actions."
The nature of the subject matter, contextual setting, and statutes in pari materia must all be viewed together in seeking legislative intent. State v. Wright, 107 N.J. 488, 502, 527 A.2d 379 (1987). Therefore, Chapters 324, 325 and 326 of the Laws of 1987 must all be viewed together in seeking legislative intent.
The Legislature, if it had so decided, could have used the words "alleged tortfeasor" or "one claimed to be a joint tortfeasor," as the State of New York has done.[5] In Purcell v. Doherty, 102 Misc.2d 1049, 424 N.Y.S.2d 991 (Sup.Ct. 1980), aff'd, 80 A.D.2d 755, 437 N.Y.S.2d 993 (1981), the court, applying the New York statute, deducted the settlement amount of $150,000 received from a party *248 found not negligent from the jury verdict of $775,000 against other defendants. For a history of New York's collateral source rule, General Obligations Laws 15-108, see Williams v. Niske, 81 N.Y.2d 437, 599 N.Y.S.2d 519, 615 N.E.2d 1003 (1993).
Plaintiffs' reliance upon Bandel v. Friedrich, 122 N.J. 235, 242, 584 A.2d 800 (1991), is misplaced because the cause of action therein pre-dated the statute. The body of case law, including Rogers v. Spady, supra, which pre-dates the statute, is overcome by the clear language of the statute. We must assume that the Legislature, in considering and adopting this statute, was aware of and chose the statutory language in light of that case law.
The inclusion of the phrase "other than a joint tortfeasor" demonstrates that the Legislature intended to exclude payments by other tortfeasors and, at least by inference, intended to include any other payment not otherwise referenced in the statute. The public policy underlying N.J.S.A. 2A:15-97 was to eliminate, to the extent possible, legal rules and principles which allow plaintiffs to receive double recovery for their injuries and damages. One apparent unspoken rationale of this statutory change in the longstanding collateral source rule was to minimize the burden on the insurance industry to the extent an injured party is fully compensated for injuries suffered. Immediately preceding the enactment of N.J.S.A. 2A:15-97, the Legislature enacted N.J.S.A. 2A:15-5.3, limiting a plaintiff's recovery against a joint tortfeasor based upon the tortfeasor's percentage of responsibility, which was clearly a response to Rogers v. Spady and Cartel Capital Corp. v. Fireco of New Jersey. Cartel held that "the effect on the plaintiff of a joint tortfeasor's settlement will depend upon the percentage of fault found against him." Cartel, supra, 81 N.J. at 569, 410 A.2d 674.
The public policy basis for the passage of N.J.S.A. 2A:15-97, reconciling the interests in permitting full compensation to injured parties, fostering settlement, and avoiding the burdens resulting from double compensation, applies with equal force and effect to plaintiff's accident and injuries. The rationale of the collateral source rule is that, if a choice is presented between overcompensating *249 an injured party to the extent of receipt of collateral source benefits or allowing a culpable party, otherwise responsible for the injury, to reap the benefit of that collateral source and avoid personal responsibility for his/her tortious actions, the innocent injured party should receive the benefit. In that respect, the collateral source rule is an exception to the general rule that a successful plaintiff in a tort action is generally entitled to recover only that quantum of damages that will justly compensate him or her for injuries caused by a defendant. The most obvious effect of the collateral source rule is that it enables a plaintiff to reap a double recovery in certain circumstances.
The collateral source rule served a legitimate public policy interest when it originated over 138 years ago[6] before the widespread use of insurance, particularly in the field of statutorily-mandated motor vehicle insurance. Now, by virtue of insurance, tortfeasors can effectively be insulated from personal responsibility for the effects of their negligent acts. The public policy considerations which have historically justified the collateral source rule no longer apply, at least in automobile negligence litigation. This case is a good example because the benefits received by plaintiffs, by way of settlement with Warnebold, were paid by the New Jersey Automobile Full Insurance Underwriting Association (NJAFIUA) through its servicing carrier. Jacob is insured for the subject accident by a policy issued by the NJAFIUA through its servicing carrier, Allstate Insurance Company. No legitimate public interest is served in this case, or in many tort cases, in allowing plaintiff to receive double recovery for his or her actual losses and damages and thus compelling the carrier for the tortfeasor to pay benefits more than once. To hold otherwise *250 would discourage settlements by co-defendants who go to trial after one or more alleged tortfeasors have settled.
The trial court denied defendant Jacob's application to offset plaintiff's entire lost income award, stating:
I don't consider that [lost income] to be a benefit from the injury. That is something that he lost, the jury found that he lost, and I'm not going to take it off him.
There is no basis for differentiating between pain and suffering damages and lost income damages. The jury determined that plaintiffs suffered damages totalling $45,000. Plaintiffs have already received $100,000 for those damages from the same source, the NJAFIUA, from whom they seek additional damages.
The orders from which plaintiffs appeal are affirmed, except that the judgment in favor of plaintiff Joszef Kiss against defendant Ziv Jacob is reversed and set aside.
NOTES
[1] Elvira Yakov was a named defendant but no judgment was rendered against her, and she is not involved in this appeal.
[2] Edith Kiss, wife of Joszef Kiss, filed a per quod claim.
[3] Plaintiff had not returned to work, allegedly as a result of the injuries sustained in the accident. Plaintiff presented medical testimony of serious limitation of mobility of his shoulder and greatly diminished power in his arm due to a brachial plexus injury. In addition, plaintiff sustained a fractured wrist allegedly causing substantial disability.
[4] Where one co-defendant who settled with plaintiff during trial was found by the jury not to be negligent and the remaining defendant was found to be 100% negligent, the remaining defendant against whom verdict was rendered was not entitled to any pro tanto reduction from the final judgment for the amount which had been paid by the co-defendant in settlement. Id. 147 N.J. Super. at 278, 371 A.2d 285.
[5] N.Y.Civ.Prac.L. & R. 4533-b provides that:

In an action for personal injury, injury to property or for wrongful death, any proof as to payment by or settlement with another joint tort-feasor, or one claimed to be a joint tort-feasor, offered by a defendant in mitigation of damages, shall be taken out of the hearing of the jury. The court shall deduct the proper amount, as determined pursuant to section 15-108 of the general obligations law, from the award made by the jury (emphasis added). N.Y.Gen.Oblig. 15-108(a) states, in part, that:
When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest (emphasis added).
[6] The collateral source rule first appeared in The Propeller Monticello v. Mollison, 58 U.S. (17 How.) 152-156, 15 L.Ed. 68 (1855), where the Supreme Court stated its belief that it was not inventing a new doctrine but merely applying an old one. Id. 58 U.S. at 154, 15 L.Ed. at 70. See Joel K. Jacobsen, The Collateral Source Rule and The Role of the Jury, U.Or.L.Rev. 523 (1991).