202 N.J. Super. 106 (1985)
493 A.2d 1314
ROBERT AYERS, ET AL., PLAINTIFFS-RESPONDENTS-CROSS-APPELLANTS.
v.
TOWNSHIP OF JACKSON, DEFENDANT-APPELLANT-CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 2, 1985.
Decided June 4, 1985.
*111 Before Judges ANTELL, J.H. COLEMAN and SIMPSON.
H. Curtis Meanor and James Stewart argued the cause for appellant (Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor, attorneys; H. Curtis Meanor and Michael L. Rodburg, of counsel; James Stewart and Michael L. Rodburg on the brief; James Stewart on the reply brief).
Steven J. Phillips, of the New York Bar, admitted pro hac vice and Donald I. Marlin argued the cause for respondents (Kreindler & Kreindler, of the New York Bar admitted pro hac vice, and Szaferman, Lakind, Blumstein & Watter, attorneys; Steven J. Phillips, Donald I. Marlin and Arnold C. *112 Lakind of counsel; Steven J. Phillips and Arnold C. Lakind on the briefs).
The opinion of the court was delivered by ANTELL, P.J.A.D.
Between the years 1972 and 1978, unknown to the Legler area residents of Jackson Township, their well water was being contaminated by toxic pollutants leaching into the Cohansey Aquifer from a landfill operated by their municipality, defendant Jackson Township (hereinafter "defendant"). On December 20, 1978 a health emergency was declared and the Department of Environmental Protection ordered defendant to instruct Legler area residents to discontinue the use of well water entirely. From then until July 1980 water for household use was provided by various improvisations. At first, the residents carried their water from tankers placed in various locations within the Legler area. Later, township employees delivered to the residents plastic-lined water containers. Finally, the residents received containers with spigots; these were filled periodically with water pumped through a hose from a water truck. By July 1980 defendant constructed a public water supply system for the Legler residents, with residents paying a $610 hookup fee, plus other expenses, and normal water service was resumed.
This appeal is taken by defendant from a judgment entered in favor of 339 residents of the Legler area who claim to have been harmed by defendant's negligent operation of its landfill. In answer to special interrogatories the jury found that defendant had created a nuisance in the operation of its landfill between 1972 and 1978, that its negligence was palpably unreasonable and that it had been the proximate cause of harm to plaintiffs. An aggregate judgment in the amount of $15,892,303.97 was entered, to be distributed among the plaintiffs in specified amounts. The award was predicated on the recognition of three major damage theories. The first was to compensate *113 plaintiffs for their emotional distress upon learning that they had been ingesting contaminated water for six years. For this the jury awarded $2,084,392. The second component was for the impact upon the quality of their lives during the twenty months when they were deprived of running water. This award was for $5,400,880. Finally, an award was made for $8,213,000 to meet the cost of medical surveillance to guard against plaintiffs' increased risk of developing cancer, liver or kidney disease produced by their exposure to contaminants. The balance of the judgment award was for relatively minor miscellaneous expenses with which we are not here concerned. The jury awarded nothing for diminution in the value of plaintiffs' property.
On this appeal defendant challenges the awards for emotional distress and quality of life. It asserts that these actually constitute compensation for pain and suffering which, under the circumstances of this case, are not allowable elements of recovery under the New Jersey Tort Claims Act, N.J.S.A. 59:9-2(d). Defendant further maintains that the award for medical surveillance is not supported by the evidence and, further, constitutes a novel form of relief which should be discouraged in light of policy considerations underlying the Tort Claims Act.
Also assailed as error are rulings as to the admission of evidence, the qualifications of expert witnesses, comments of counsel in summation, the amount of the awards and an alleged determination by the trial court concerning the future rights of plaintiffs.
On their cross-appeal, plaintiffs argue that the trial court erred in allowing a pro tanto reduction of the judgment by the amount of an $850,000 settlement with a codefendant, in dismissing before trial plaintiffs' claims for relief under the Civil Rights Act of 1871, 42 U.S.C.A. § 1983, and in refusing to allow recovery of damages for plaintiffs' enhanced risk of disease.
*114 Our inquiry begins with well established principles under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq. "The basic approach of the Act is to reestablish sovereign immunity against tort claims except where there is a statutory declaration of liability. See Malloy v. State, 76 N.J. 515, 518-519 (1978)." Bell v. Bell, 83 N.J. 417, 423 (1980). The provisions of the Act defining the limits of governmental liability and immunity are contained in N.J.S.A. 59:2-1 through 2-10. New Jersey case law has consistently acknowledged the goals of the Act as insulating government from tort liability and discouraging unique claims.
As we said of these enactments in English v. Newark Housing Auth., 138 N.J. Super. 425, 428-429 (App.Div. 1976), "the basic legislative premise is to re-establish immunity for all governmental bodies within its definition of `public entity.' Immunity is all-inclusive within that definition except as otherwise provided by the act." In the comment accompanying N.J.S.A. 59:2-1 the thought is expressed that under this enactment the judicial approach should be "whether an immunity applies and if not, should liability attach" (emphasis in original). This was said to mark a departure from that taken by our Supreme Court in B.W. King, Inc. v. West New York, 49 N.J. 318, 325 (1967), "asking whether there is any reason why it [immunity] should apply." It was hopefully contemplated that "in utilizing this approach the courts will exercise restraint in the acceptance of novel causes of action against public entities." The comment closes with the following paragraph: Subsection (b) is intended to insure that any immunity provisions provided in the act or by common law will prevail over the liability provisions. It is anticipated that the Courts will realistically interpret both the statutory and common law immunities in order to effectuate their intended scope.
Fair v. Bergen Cty., 151 N.J. Super. 520, 522-523 (App.Div. 1977). See also Cobb v. Waddington, 154 N.J. Super. 11, 16 (App.Div. 1977), certif. den. 76 N.J. 235 (1978). Specifically pertinent to this appeal is the following provision in N.J.S.A. 59:9-2(d) addressing recoverability of damages for pain and suffering:
No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00. For purposes of this section medical treatment expenses are defined as the reasonable value of services rendered for necessary surgical, medical and *115 dental treatment of the claimant for such injury, sickness or disease, including prosthetic devices and ambulance, hospital or professional nursing service.
The comment to the foregoing statute, also relevant, states:
The limitation on the recovery of damages in subparagraph (d) reflects the policy judgment that in view of the economic burdens presently facing public entities a claimant should not be reimbursed for non-objective types of damages, such as pain and suffering, except in aggravated circumstances  cases involving permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000. The limitation that pain and suffering may only be awarded when medical expenses exceed $1,000 insures that such damages will not be awarded unless the loss is substantial.
It is undisputed that none of the plaintiffs has suffered bodily injury approaching the kind described in the statute as prerequisite to the recovery of damages for pain and suffering or has incurred any expenses for medical treatment made necessary by defendant's negligence.

Emotional Distress
Plaintiffs' claims for emotional distress were based upon their feelings of dismay and anxiety for their own health and that of their families upon learning that they had been consuming and bathing in contaminated water. Their anguish was variously described in terms of fear, anger, apprehension and humiliation. Do these constitute "pain and suffering" for which recovery is barred under N.J.S.A. 59:9-2(d)?
Pain and suffering encompasses "physical or mental injury or suffering." Botta v. Brunner, 26 N.J. 82, 95 (1958). "[M]ental injury or suffering" was again categorized under the concept of pain and suffering in Doud v. Housing Authority of Newark, 75 N.J. Super. 340, 346 (App.Div. 1962). And in Tramutola v. Bortone, 118 N.J. Super. 503, 518 (App.Div. 1972), aff'd in part as mod., and rev'd and remanded in part on other grounds, 63 N.J. 9 (1973), "psychiatric injury" was equated with "physical pain" for purposes of damages in a personal injury action. From the Supreme Court decision it appears that a medical opinion was offered that plaintiff was suffering from

*116 "... a chronic anxiety and depressive reaction, which is an emotional reaction and a mood disturbance related to the difficulties which he had following this operation, particularly to the knowledge, the awareness of a retained metallic fragment and the prospect, although not a certain one, of a potential surgical procedure in the future." [63 N.J. at 14]
In one civil rights case it was held that plaintiff's humiliation and her physical and emotional distress constituted pain and suffering for which the Civil Rights Commission could award damages. Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399, 404, 416 (1973). Berman v. Allan, 80 N.J. 421, 433 (1979) also viewed "emotional suffering * * * mental and emotional distress" as forms of pain for which damages were equally recoverable.
We cannot conceive how plaintiffs' concern that their exposure to toxic wastes might have precipitated a serious illness can be characterized as anything other than pain and suffering. It is a measure of their entirely subjective responses to a situation which, though threatening, never materialized into objective manifestations of injury. Under the circumstances, we conclude that although damages for these intangible harms might be recoverable from a non-governmental entity, as consequential to a nuisance, the language of N.J.S.A. 59:9-2(d), barring damages from a public entity "for pain and suffering resulting from any injury," clearly precludes recovery herein. If it is plaintiffs' contention that their emotional distress was a primary and independent result of the nuisance, not one which is merely secondary to another injury, we remain unpersuaded that it constitutes such an injury as is redressible under the Tort Claims Act.

Quality of Life
When defendant first began supplying water to the Legler residents, the residents had to carry the water to their homes from storage tanks. Leaks from the tanks sometimes created icy patches on which the residents occasionally fell. Later, water was delivered to the houses in civil defense barrels. If a *117 delivery was required on a particular day a resident placed a white cloth on his mailbox. If the resident was not home at the time of delivery the barrel, weighing about 120 pounds, was left outside for the residents to carry in. Occasionally, the water barrels contained debris such as fatty meat. In the winter, the water often froze and had to be defrosted before use. Some residents went out to the garage in the middle of the night for water only to find a barrel of ice. One witness, who suffered from arthritis, testified to hauling her water for drinking, cooking and bathing up nine steps because, as she said,
[t]here was no way that I could get the water upstairs except by hauling pot after pot out of the containers, ... which was a considerable amount of hauling everyday just to use for drinking and bathing the children and cooking.
Testimony was also heard about friction among household members created by living without basic conveniences. The adverse impact upon the social life of the residents was also severe since the presence of guests in a home without running water often produced acute embarrassments.
The interest violated by the pollution of plaintiffs' ground water was described as "quality of life." In McDonald v. Mianecki, 79 N.J. 275 (1979), the trial court allowed compensation to plaintiffs for "deterioration in their quality of living" resulting from defendant's failure to provide plaintiffs with potable well water as part of the sale of a new home. Id. at 282. The concept was not elucidated, but the Supreme Court commented that the "items of awardable damages charged were ... appropriate as incidental and consequential damages." Id. at 282, n. 1. The evidence in the case was to the effect that because plaintiffs could not use their well water for cooking and drinking they were forced to use bottled water or water obtained at the home of a neighbor. Assuming that the recognition of "quality of life" as a protectible value was intended by McDonald to be viable only in connection with a warranty of habitability, the idea nevertheless has its counterpart in the law of nuisance as applied to this case. Whatever label we place *118 upon plaintiffs' injury, their right of recovery is supported by familiar principles.
There is no question as to the liability of a municipality for nuisance based on water pollution. Birchwood Lakes Colony Club v. Medford Lakes, 90 N.J. 582, 592-593 (1982). As to damages, Restatement, Torts 2d. § 929(1) states:
If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for * * * (c) discomfort and annoyance to him as an occupant.
The comment thereto is as follows:
Discomfort and annoyance to an occupant of the land and to the members of the household are distinct grounds of compensation for which in ordinary cases the person in possession is allowed to recover in addition to the harm to his proprietary interests. He is also allowed to recover for his own serious sickness or other substantial bodily harm but is not allowed to recover for serious harm to other members of the household, except so far as he maintains an action as a spouse or parent, under the rules stated in §§ 693 and 703. The owner of land who is not an occupant is not entitled to recover for these harms except as they may have affected the rental value of his land.
See also Prosser, The Law of Torts, § 90 at 603 (4 ed. 1971).
We distinguish between the subjectively measured damages for pain and suffering, which are not compensable by the Tort Claims Act, and those which objectively affect quality of life by causing an interference with the use of one's land through inconvenience and the disruption of daily activities. The problem was treated in Kornoff v. Kingsburg Cotton Oil Co., 45 Cal.2d 265, 288 P.2d 507 (1955). There, plaintiffs recovered in nuisance for damages caused by offensive materials drifting from defendant's ginning mill into plaintiffs' home. Lint and ginning waste had settled on plaintiffs' furniture, lawns, flowers, shrubs, window screens and hedges to the annoyance and discomfort of plaintiffs, 288 P.2d at 512, for which, defendant argued, there could be no recovery absent proof of personal injury. After an extensive review of authority the Supreme Court of California made the critical differentiation in the following way:
There seems to be no sound reason to refuse to award damages for discomfort and annoyance where the only injury is to the real property since it is obvious *119 that such an injury may cause discomfort and annoyance without also causing an actual physical injury to the person. [Id. at 513]
The foregoing language enlarges upon the Court's earlier observation that "[w]hile defendant's trespass here is not of the type to cause fright or shock ... it obviously is of the type to cause plaintiff much annoyance and discomfort." Id. at 512.
The disruption and inconvenience introduced into the lives of plaintiffs by contamination of their wells is qualitatively different from their pain and suffering in the form of anguish brought about by the knowledge that they had been consuming toxic wastes. The former is objectified by actual events and deprivations caused by the tangible alteration of plaintiffs' physical environment. It may be indirectly experienced and its impact grasped by people of ordinary experience and understanding independent of plaintiffs' individualized emotional and mental responses. Thus, damages are awarded for the interruption of this common convenience in an amount equal to the value which would be placed upon its availability by ordinary people. This is distinct from its special consequences to the sensibilities of individual plaintiffs. In our view, the pain and suffering contemplated by N.J.S.A. 59:9-2(d) encompasses only the latter, not the former.
It has been suggested that damages for interference with the use of land are generally measured in terms of depreciated market value. Dobbs, Remedies, 334 (1973). However, it appears to us that greater flexibility can be allowed where "damages for personal discomfort or illness resulting from the nuisance" are concerned. As that text concedes, "[v]ery little guide can be furnished for determining this kind of damage, of course, and the amount of such damages is peculiarly a jury question." Ibid., n. 14.
Although damages for this injury might have been cast in terms of depreciated market or rental value during the twenty months in question, we find no error in the instructions given by the trial court for the jury to arrive at a judgment for *120 disrupted quality of life based on its "sound discretion ... common sense and collective experiences as humans and as members of the jury."
We conclude that the award of $5,400,880 as damages for infringement upon plaintiffs' "quality of life" does not represent compensation for the pain and suffering barred by N.J.S.A. 59:9-2(d); rather, it is compensation for damages characterized by inconvenience and disruption of daily activities, and is sanctioned by established principles of the law of nuisance. Moreover, the award is supported by competent evidence in the record. McDonald v. Mianecki, 159 N.J. Super. 1, 25 (App.Div. 1978), aff'd 79 N.J. 275 (1979).

Medical Surveillance
More than half of the judgment, $8,330,000, was awarded to meet the cost of medical tests deemed necessary over the years for the early detection of cancer. This award was based on the testimony of Dr. Highland, a toxicologist, that because of their prolonged exposure to carcinogenic wastes all of the plaintiffs were subject to an "increased risk" of contracting cancer during their lifetimes. The standard United States lifetime risk of contracting cancer is .331 in 3 or approximately one in ten.
Apart from saying that certain of the plaintiffs, such as very young children or infants in utero, are more vulnerable than others, Dr. Highland was unable to say by how much the risk of cancer had been increased. On this point he spoke clearly and with deliberation. In part, the problem stems from the fact that numerous chemical agents are here involved. He explained that although some methodologies exist for "trying" to estimate a level of risk from exposure to a single chemical, "the fact that there can be interactions between chemicals makes it impossible at the current time to accurately quantify or to tell you the level quantitatively of risk." All he could say, therefore, was that "there is an increased level of risk of cancer in *121 the future deriving from the fact that there is exposure to carcinogens, and the greater the degree of exposure, the greater the level of risk."
Plaintiffs' brief states that Dr. Highland concluded that "virtually all plaintiffs were at significant and substantial increased risk of developing cancer," and that they "had a high or a very high likelihood of developing liver or renal disorders." But we do not find these assertions borne out by the transcript passages to which we were referred for supporting testimony. None of the plaintiffs claims to be suffering from illness caused by defendant. None has received medical treatment necessitated by exposure to contaminants. Although testimony was heard about the birth of crippled livestock, and death and disease among family members, nothing was offered to show that these were in any way related to the consumption of contaminated water. The most plaintiffs say is that they may have sustained sub-clinical cellular damage. As we understand it, this rests entirely upon the opinion of Dr. Highland unsupported by any clinical evidence.
The status of sub-clinical cellular damage was recently considered in Schweitzer v. Consolidated Rail Corp., 758 F.2d 936 (3d Cir.1985). The question there presented was whether claims arising from asbestos-related injuries had been discharged in bankruptcy. The answer turned on whether the cause of action arose before or after the consummation date of defendant's reorganization in bankruptcy. Plaintiffs argued that because the illnesses did not become manifest until after the reorganization the claims were not barred. Defendant answered that although the illnesses were not yet manifest, based upon the sub-clinical existence of the asbestos-related harm the cause of action accrued before the reorganization. The court's analysis took the following form:
It is true that the possible existence of subclinical asbestos-related injury prior to manifestation may be of interest to a histologist. See Insurance Company of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1218 (6th Cir.1980), clarified 657 F.2d 814 (1981), cert. denied, 454 U.S. 1109 *122 [102 S.Ct. 686, 70 L.Ed.2d 650] (1981). Likewise, the existence of such injury may be of vital concern to insurers and their insureds who have bargained for liability coverage triggered by "bodily injury." See id. We believe, however, that subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.
Moreover, we are persuaded that a contrary rule would be undesirable as applied in the asbestos-related tort context. If mere exposure to asbestos were sufficient to give rise to a F.E.L.A. cause of action, countless seemingly healthy railroad workers, workers who might never manifest injury, would have tort claims cognizable in federal court. It is obvious that proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for those who do. Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purpose of tort law: the compensation of victims who have suffered. Therefore we hold that, as a matter of federal law, F.E.L.A. actions for asbestos-related injury do not exist before manifestation of injury. [At 942]
The foregoing expressions are even more clearly apposite to this proceeding. In Schweitzer the Court had before it the clinical manifestations of asbestos-related illnesses which appeared after the corporate reorganization. From these, it could at least be reasonably concluded  from hindsight if nothing else  that they were preceded by sub-clinical cellular damage. Here, there is nothing to support Dr. Highland's opinion that sub-clinical cellular damage has occurred, or to show what the probabilities are that such damage is the precursor of actual illness. As we have said, plaintiffs' claims of increased risk are not documented by a single incident of pollution-related illness. Faced with the admitted inability of the expert witness to quantify the increased risk, we cannot rule out the probability that such increase is so microscopically small as to be meaningless. Without some quantifying guidance it becomes impossible to say that defendant has so significantly increased the "reasonable probability," Coll v. Sherry, 29 N.J. 166, 175 (1959), that any of the plaintiffs will develop cancer so as to justify imposing upon defendant the financial burden of lifetime medical surveillance for early clinical signs of cancer. In reaching this conclusion we heed the Legislature's hopeful expectation that "the courts will exercise restraint in the acceptance of *123 novel causes of action against public entities." Comment, N.J.S.A. 59:2-1.

Testimony of Wayne Saunders
Dr. Daniel Raviv, who testified for plaintiffs as an expert on geohydrology, concluded that a groundwater mound caused contaminated water to move as far upgrade as Miller Road. But Wayne Saunders, a geologist who also testified on behalf of plaintiffs, opined that the landfill was the source of contaminants even farther upgrade to Bowman Road. Defendant contends that Saunders' credentials did not qualify him to offer the foregoing testimony.
Saunders took into account information filed with the Bureau of Solid Waste Management on the landfill, documents about the geology, groundwater and geohydrology of the landfill area, chemical and analytical data on the groundwater, and documents concerning the amount of liquid waste received at the landfill. He performed resistivity studies and profiling in the area, although not specifically near Bowman Road. His conclusion was based on the presence of contaminants in wells on Bowman Road, the volume of liquids at the landfill and his belief to a reasonable certainty that a groundwater mound was created, thereby allowing contaminants to move against the natural gradient. This belief, incidentally, was shared by Dr. Raviv.
Defendant contends that because Saunders did not have data actually showing the existence of the mound his testimony should have been excluded. Stressing that Saunders had no special expertise in the migration of contaminants except by geophysical investigation, which, as we said, was not performed in the Bowman Road area, defendant relies on the principle that a witness' testimony in specialized areas in which he lacks real expertise does not assist the trier of fact and should therefore be excluded. Nesta v. Meyer, 100 N.J. Super. 434, 442 (App. Div. 1968).
*124 "The qualifications of experts are left to the discretion of the trial court and the decision is conclusive unless clearly shown to be erroneous as a matter of law." Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 141 (1950). See also Henningsen v. Bloomfield Motors, 32 N.J. 358, 411 (1960); Spiegle v. Seaman, 160 N.J. Super. 471, 478 (App.Div. 1978). If a witness has training, education, knowledge or experience that will help a jury understand evidence or determine a fact in issue he may qualify. Evid.R. 19, 56(2). Saunders' degree is in geology, but he has taken graduate courses in groundwater hydrology and has taught courses in geophysical techniques for groundwater monitoring. He has worked as a project geologist investigating groundwater contamination throughout the United States. Between 1977 and 1981 he investigated over 70 cases of groundwater contamination in New Jersey, was promoted to the position of principal geologist and thereafter became supervising geologist. He has determined groundwater flow and groundwater elevations, and has previously testified on the subject in court. Based on the foregoing qualifications we are satisfied that the trial judge did not mistakenly exercise his discretion in permitting the challenged testimony.
Defendant also argues that the trial court erred in ruling that if, at some future time, plaintiffs should contract cancer, liver or kidney disease they could then sue defendant for resulting damages. The ruling was made in connection with a pretrial motion addressed to plaintiffs' right to damages for their enhanced risk of contracting the foregoing diseases because of defendant's tortious conduct and is reported in Ayers v. Jackson Tp., 189 N.J. Super. 561, 566-568 (Law Div. 1983). At issue is the applicability of the single controversy doctrine. See Aetna Ins. Co. v. Gilchrist Bros., Inc., 85 N.J. 550, 556-557 (1981).
Defendant's attack centers on an observation made by the trial court in response to plaintiffs' contention that, absent a right of recovery for enhanced risk, they would be left without *125 a remedy "if in the future any plaintiff suffers from a physical condition which can medically be attributed to ingestion of the alleged contaminants." 189 N.J. Super. at 568. To this the trial judge replied only that under the "discovery" rule, Lopez v. Swyer, 62 N.J. 267, 272 (1973), the statute of limitations would not begin to run until a plaintiff became aware that he had sustained injury or that his damage was caused by defendant's fault. It is therefore dictum only and has no controlling significance to the future rights of the parties. Moreover, in view of our disposition of plaintiffs' claims for emotional distress and medical surveillance, the single controversy doctrine is no longer applicable.
Finally, defendant asserts that R. 1:7-1(b) was violated in that plaintiffs' counsel suggested to the jury that damages be calculated on a time-unit basis and that the judge failed to instruct the jury that the comments were argumentative only and did not constitute evidence. Under R. 1:7-1(b) plaintiffs were permitted to urge the jury to calculate damages on a time-unit basis so long as reference was not made to any specific sum. Although counsel suggested an analogy to vacation time, he did not intimate what its value should be and thus did not breach the limitation upon suggesting a specific sum of money.
On their cross-appeal plaintiffs first argue that the trial court erred in dismissing their claims for enhanced risk. See Ayers v. Jackson Tp., 189 N.J. Super. at 568. While it is true that damages are recoverable for the prospective consequences of a tortious injury, it must be demonstrated that the apprehended consequences are reasonably probable. Coll v. Sherry, 29 N.J. at 174-175. As we explained in connection with plaintiffs' claims for future medical suveillance, the degree of increased risk was in no way quantified. Indeed, that function was described by plaintiffs' expert witness as "impossible," and we therefore conclude that a reasonable probability of enhanced risk is not supported by the evidence. We discern no way to *126 compensate one for enhanced risk without knowing in some way the degree of enhancement. Additionally, the recoverability of damages for enhanced risk in this state has not been decided. See Evers v. Dollinger, 95 N.J. 399, 406 (1984).
Shortly after the trial began plaintiffs settled with township engineer John Ernst, a named codefendant, for $850,000. The jury was not told of the settlement and the case against Ernst proceeded. Ernst was found not negligent, and the trial court granted the motion of defendant Jackson Township for a reduction of the judgment against it in the amount of the settlement pursuant to N.J.S.A. 59:9-3 and 59:9-2(e).
N.J.S.A. 59:9-3(b) provides that if an entity is determined to be a joint tortfeasor, the amount paid to plaintiff pursuant to a settlement with an alleged tortfeasor shall be reduced pro tanto from the injured parties' judgment against any other tortfeasor. Plaintiffs argue that this section is inapplicable because Jackson Township was found to have been a sole tortfeasor. However, N.J.S.A. 59:9-2(e) mandates that such a deduction be made if "a claimant receives ... benefits for the injuries allegedly incurred from ... any other source other than a joint tortfeasor...." Plaintiffs contend that because the application of this section to the Ernst settlement would render N.J.S.A. 59:9-3(b) superfluous, the deduction should be disallowed. We disagree.
If Ernst was not a joint tortfeasor and N.J.S.A. 59:9-3 does not apply, then Ernst must be a source "other than a joint tortfeasor." Assuming that there is some overlapping between the two statutes, we give greater weight to the fact that the purpose of N.J.S.A. 59:9-2(e) "is to prohibit the receipt of duplicate benefits by a claimant filing suit under the act." Comment, N.J.S.A. 59:9-2. There can be no doubt that this is the overriding legislative intent. In carefully addressing itself to the two distinct situations, one where the public entity is a joint tortfeasor and the other where it is a sole tortfeasor, the *127 lawmakers demonstrated their purpose to seal off any possibility of a claimant receiving benefits beyond damages awarded under a judgment entered against a public entity. In the last analysis our search is for the true intention of the law. "It is not the words, but the internal sense of the law that controls." Wollen v. Fort Lee, 27 N.J. 408, 418 (1958). "As between two possible constructions of a statute, the one which most closely effectuates legislative policy must control." Borough of Park Ridge v. Salimone, 21 N.J. 28, 49 (1956). Where the Legislature has acted so broadly to require deductions from awards against public entities of benefits received by a claimant, even to the point of including payments under policies of insurance, we find unpersuasive any interpretation of the statute which would exclude from the deduction requirement settlement monies received from an alleged joint tortfeasor later determined to have been non-negligent.
Before trial the court dismissed plaintiffs' claim under the federal Civil Rights Act of 1871, 42 U.S.C.A. § 1983. Plaintiffs contended that Jackson Township and its officials, acting under color of state laws, had wrongfully taken property by contaminating plaintiffs' wells without just compensation. In Adelung v. Jackson Tp. (unreported), a related case in the federal district court for the District of New Jersey, which involved the same parties, the court concluded on motion that these claims qualified for jury consideration. However, in this state court proceeding the trial court, in a ruling from which plaintiffs cross-appeal, dismissed the same claims. With respect thereto plaintiffs maintain that the determination in the federal court became the "law of the case," from which the state court trial judge herein should not have strayed. Plaintiffs rely upon State v. Bell, 89 N.J. Super. 437, 440 (App.Div. 1965) and United States v. Wessel, Duval & Co., Inc., 123 F. Supp. 318, 324 (S.D.N.Y. 1954). These cases involved pretrial rulings of one judge upheld by the trial judge in the same court in the same case. Plaintiffs cite no authority in which the law of the case *128 doctrine was applied to bind a state court to a federal court ruling.
The law of the case doctrine is a non-binding discretionary rule of practice. State v. Hale, 127 N.J. Super. 407, 411 (App.Div. 1974). Its purpose is to avoid relitigation of the same issue in the same suit. It is addressed to the good sense of the court as a cautionary admonition against relitigation. In the case before us a federal constitutional issue was involved and the federal court ruling was therefore entitled to deference and judicial comity. State v. Norflett, 67 N.J. 268, 286 (1975). However, the trial court was not bound to follow the ruling. The doctrine does not prohibit one judge from reviewing the prior ruling of another judge, Dictograph Prods. Co. v. Sonotone Corp., 230 F.2d 131, 134-136 (2d Cir.1956), appeal dismissed, 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956), particularly where the purpose of review is to correct an erroneous ruling, In re Allied Elec. Prods., Inc., 194 F. Supp. 26, 29 (D.N.J. 1961).
Plaintiffs maintain that the trial court erred in dismissing their § 1983 claim of an unconstitutional taking, asserting that the court misinterpreted Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Parratt recognized that there are situations in which post-deprivation procedures or remedies are sufficient to satisfy due process. It held that a state remedy for a tortious deprivation of property is sufficient where it provides "the means by which [the injured party] can receive redress for the deprivation" even though the remedy it affords is not as complete as the § 1983 remedy. Id. at 543-544, 101 S.Ct. at 1916-1917. In our view, an adequate post deprivation remedy has been provided within the New Jersey Tort Claims Act in the form of a right of recovery for tortious conduct on the part of a public entity. In Birchwood Lakes Colony Club v. Medford Lakes, supra, the Supreme Court affirmed a holding of the Appellate Division which permitted the maintenance of a nuisance action against a municipality *129 "under and subject to the standards of the Tort Claims Act." It added that "[t]o hold otherwise would seriously implicate an unconstitutional invasion of the riparian owner's interests." 90 N.J. at 596, n. 5. We interpret the foregoing to imply that where such an action is allowed, as in this case, this constitutional standard is satisfied.
Although, as plaintiffs argue, if they had been allowed to proceed with their § 1983 claim they might have been awarded counsel fees under 42 U.S.C.A. § 1988, their point deals only with the completeness of the remedy. As we noted earlier, a state remedy may be sufficient, even if not as complete as that allowed under 42 U.S.C.A. § 1983. Parratt, 451 U.S. at 544, 101 S.Ct. at 1917.
The judgment under review is modified by vacating so much of the award as allows recovery for emotional distress and medical surveillance. As modified, the remaining judgment for $5,594,411.97 is affirmed.