225 N.J. Super. 485 (1988)
542 A.2d 975
PATRICIA RUBANICK, EXECUTRIX OF THE ESTATE OF RONALD G. RUBANICK, AND PATRICIA RUBANICK, GUARDIAN AD LITEM FOR DAMIEN RUBANICK AND RONALD C. RUBANICK, INFANTS, PLAINTIFFS,
v.
WITCO CHEMICAL CORP. (FOR DISCOVERY), WITCO CHEMICAL CORP., MONSANTO COMPANY (FORMERLY MONSANTO CHEMICAL CORP.), ABC CORP. (A FICTITIOUS CORPORATION); DEF CORPORATION (A FICTITIOUS CORPORATION); JOHN DOE (IDENTITY UNKNOWN) AND CARL DOE (IDENTITY UNKNOWN), DEFENDANTS.
Superior Court of New Jersey, Law Division (Civil), Middlesex County.
Decided April 29, 1988.
*488 Edith K. Payne and Michael Dore for defendant Monsanto (Stryker, Tams & Dill).
Alfred F. Russo, for plaintiffs (Russo & Casey).
HAMLIN, J.S.C.
Defendant Monsanto Chemical Company brings this motion in limine to exclude the testimony of plaintiff's sole expert in this toxic tort wrongful death action. Plaintiff's decedent, Ronald Rubanick, was employed by Witco Chemical Company from 1974 to 1979 at its Perth Amboy facility. In 1979 Rubanick was diagnosed as suffering from colon cancer which had reached stage four, having already metastasized to other sites. Despite aggressive treatment at local hospitals and the Sloan-Kettering Cancer Institute in New York City his condition steadily declined and he expired on July 23, 1980 at age 29. Plaintiff is decedent's widow and brings this action in her own right and as guardian ad litem for her two minor children. The complaint alleges that during Rubanick's employment at Witco he was exposed to a toxic chemical compound, polychlorinated biphenyls (PCBs), manufactured by Monsanto and sold to Witco for use as a heat transfer fluid. It is plaintiff's contention that PCBs are generally a carcinogen in humans and specifically the proximate cause of Rubanick's colon cancer and his resultant death. Plaintiff's only proffered evidence as to causation is Earl Balis, Ph.D., a biochemist cancer researcher.
Defendant seeks to bar the testimony of Dr. Balis on the following theories:
1.) That a biochemist is not a qualified expert pursuant to Evid.R. 56 to testify generally as to human cancer causation.
*489 2.) That a biochemist is not a qualified expert pursuant to Evid.R. 56 to testify as to cancer causation in relation to a specific individual.
3.) That Dr. Balis has expressed a novel scientific opinion not generally accepted by the scientific community.
4.) That Dr. Balis' opinion is not supported by an adequate scientific and factual basis.
Those questions require the Court to resolve issues of novel impression as to the degree of expertise necessary to testify as to human cancer causation and to determine the state of medical research regarding carcinogenic effects of PCB exposure. In dealing with these issues an extensive Rule 8 hearing was held wherein the Court received testimony from physicians, a toxicologist, an epidemiologist and a biochemist. Prior depositions, medical records, numerous esoteric laboratory studies and employment records were received in evidence. The testimony covered three days and shall be referenced by volume number, (Vol. I, 9/9/87, Vol. II, 9/10/87, Vol. III, 9/14/87) and page. As the moving party Monsanto had the burden of going forward with sufficient evidence to call into question the admissibility of the proffered testimony. Having so done the burden of proof switched to plaintiff to satisfy the Court by the preponderance of the credible evidence as to his witness' expertise, both generally and specifically, the adequacy of the factual foundation for his opinion and scientific acceptance of the theory that formed the basis of his proffered opinion. Evid.R. 19, 56(2).
In brief Dr. Balis offers the opinion that PCBs are a human carcinogen in general and specifically that Rubanick's exposure to PCBs during his employment at Witco was a proximate cause of his colon cancer and resultant death. Monsanto asserts that there is no general or substantial minority acceptance by the scientific community of human carcinogenicity of PCBs and further that Balis' factual basis as to exposure and contact by Rubanick, given accepted medical standards, is fatally deficient. *490 The motion is critical to the litigation. If Dr. Balis is not permitted to testify as to his opinion plaintiff cannot prevail in this action. The question is ripe for disposition.
In sustaining its prima facie burden, Monsanto produced three witnesses. Dr. Thomas Fahey is a licensed physician and a board certified internist. He is the deputy physician in charge of the Memorial Hospital at Sloan-Kettering and Associate Dean of Medicine at Cornell University Medical College. He has been continuously associated with Sloan-Kettering during his professional career with principal emphasis on clinical care of oncology patients. He has broad and deep experience in the diagnosis and treatment of cancer generally and colon cancer specifically. He has participated in research protocols and publications on patients with endocrine related cancers. He has performed no bench laboratory research and has published nothing on carcinogenesis. Dr. Fahey is familiar with epidemiological principles and their scientific uses but he has published nothing in the field and does not hold himself out to be an expert in the field. Although he has done no prime research in carcinogenesis he is familiar with the scientific literature and is familiar with identified human carcinogens. He has done no research on the specific issue of the effect of PCB exposure on humans or animals. Dr. Fahey concedes that a biochemist with primary research responsibilities would be more conversant with carcinogenesis literature than a treating clinical physician.
Raymond Harbison, who holds a Ph.D. in toxicology, testified on behalf of Monsanto. Dr. Harbison has been a toxicologist for 17 years and is currently Director of Toxicology at the University of Arkansas in conjunction with the National Center for Toxicological Research. In addition to his toxicological training Dr. Harbison holds a degree in pharmacology and has conducted primary research at both the Tulane Medical School and the Vanderbilt University Medical Center. He currently is a consultant for the National Institute of Health, and has been a consultant to the United States Environmental Protection *491 Agency on the toxic effects on humans of PCB exposure. He has additionally served as a consultant to many state agencies on toxic substances and their regulation. He has special knowledge and experience with human exposure to PCBs and is fully conversant with human epidemiological studies. Dr. Harbison has been directly involved, over the last 6 years, with a medical and toxicological study of employees of a PCB disposal company in Arkansas which disposes of PCBs from all over the United States. He has studied and evaluated over three hundred subjects annually who handle PCBs on a daily basis. As part of the project the study examines workers in the PCB disposal industry as to: their general medical condition, PCB blood levels, dermatological condition and possible liver abnormalities. Dr. Harbison recognizes as valid scientific authorities: The Environmental Protection Agency (EPA), the Occupational Safety and Health Administration (OSHA), and the National Institute of Occupational Safety and Health (NIOSH). He does not recognize the International Agency for Research of Cancer (IARC) as a valid scientific authority.
Dr. Philip Cole testified as an expert epidemiologist. Epidemiology is the study of the distribution and determination of causes of diseases of human beings. Dr. Cole is a licensed medical doctor and holds a Ph.D. from the Harvard School of Public Health where he subsequently served as a full-time professor of epidemiology. He currently is the chairman of the Department of Epidemiology at the University of Alabama and chairman of the National Cancer Institute committee on human cancer causes. He previously spent one year in the Department of Epidemiology of the IARC. Dr. Cole is currently a member of the Board of Scientific Counsellors of the Division of Cancer Causes and Research. Dr. Cole is thoroughly familiar with epidemiological principles and conclusions therefrom and is conversant with both the medical and epidemiological literature as to cancer causation and PCB exposure. Dr. Cole does not recognize the IARC as completely authoritative in human cancer causation.
*492 Plaintiff offered Dr. Earl Balis as his sole expert witness. Dr. Balis holds a Ph.D. in biochemistry. Although currently retired, Dr. Balis was engaged for 37 years as a primary cancer researcher at the Sloan-Kettering Cancer Center. During that time he headed up a research group concerned with the investigation of the cause, diagnosis and treatment of colon cancer. He has previously served as chairman of the Department of Biochemistry of the Cornell University Medical College and was an associate editor of the publication General Cancer Research. He has personally authored or participated in the publication of approximately 170 scientific articles of which approximately 15 dealt with carcinogenesis. He has authored nothing specifically on the carcinogenicity of PCBs. Dr. Balis has served on the National Large Bowel Cancer Committee. He has previously served on a research team with Dr. Nancy Keminey, Rubanick's treating physician at Sloan-Kettering. Dr. Keminey was not offered as a witness in this case. Dr. Balis recognizes IARC as authoritative but questions the NIOSH study done by Witco. He is widely conversant with the literature on carcinogenesis. He concedes he does not possess Dr. Cole's qualifications in epidemiology. He has never testified in court as an expert before this case.
1.) May Dr. Balis offer an opinion on human carcinogenesis generally?
While expert testimony should be rejected by a trial court very cautiously, Evid.R. 7, Germann v. Matriss, 55 N.J. 193 (1970), a trial court's discretion will not be lightly disturbed absent clear error. Foley Machinery Co. v. Amland Contractors, Inc., 209 N.J. Super 70 (App.Div. 1986). Dr. Balis has never testified in a court of law as to human medical causation. Nonetheless, Dr. Balis' entire career has been in cancer research. His publications in recognized scientific journals include articles on carcinogenesis. Testimony in the Rule 8 hearing clearly demonstrates the wide ranging scientific study of cancer. While laymen customarily think of physicians as *493 prime sources of medical theory, it is clear that modern medical conclusions are based upon numerous scientific sources. Clearly epidemiologists and toxicologists may be relied upon to contribute to our understanding of human disease and occurrence. In addition there is cross reliance to many other disciplines. Research done by molecular biologists, pharmacists, radiologists, and chemists make up only part of the body of scientific sources recognized in the continuing investigation of cancer, its causation and treatment. Such reliance by experts on the opinions of others is recognized and accepted by the courts. Evid.R. 56(2). As indicated in comment 7, "* * * the law merely recogniz[ed] that in all scientific inquiry it is common for one expert to premise an opinion on those of fellow technicians in related or cognate fields of science." In this case even defendant's expert Fahey concedes that as to basic research he would rely on competent biochemists who are often more conversant with carcinogenesis research than a clinical physician.
Broad cross qualification is often recognized and accepted. The following cases are instructive: Ayers v. Jackson Twp., 202 N.J. Super. 106 (App.Div. 1985), (geologist may testify as to toxic pollutant migration); Rosenberg by Rosenberg v. Cahill, 99 N.J. 318 (1985), (medical doctor may testify as to chiropractic standards held in common). Thus, as to general qualification the Court is satisfied that given the training, experience, research and familiarity of Dr. Balis with the scientific literature on carcinogenesis, a biochemist is properly qualified under Evid.R. 19 and 56(2) to offer an opinion as to human carcinogenesis generally.
2.) May Dr. Balis testify as to PCB causation of decedent's colon cancer specifically?
Notwithstanding Dr. Balis' knowledge and background in cancer research, he has conducted no human research, never examined a human patient, made a clinical diagnosis, or prescribed a course of treatment. In sustaining a burden of proof *494 to a reasonable degree of medical certainty as to individual physical condition, a broad base of knowledge is required not only of a suspected carcinogen but of its dynamic effect on a specific individual's vital systems.
While it is generally conceded that some substances are known human carcinogens, such as asbestos or tobacco smoke, it does not follow that all cancers that occur in an exposed population are causally related to such exposure. Indeed one of the continuing questions in cancer research revolves around why some persons, even though heavily exposed to known carcinogens, do not develop the disease while others will.
This is especially true in the instant case. Assuming, arguendo, that some PCBs may be carcinogenic to humans and those particular PCBs were present in sufficient quantities at Witco at the time in question, any competent opinion as to causation must deal with other exposures, family history, onset of the disease and its progress in relation to generally held medical principles of latency and metastasis
In offering the Dr. Balis opinion of PCBs as causation of decedent's colon cancer plaintiff must deal with an accepted body of cancer knowledge. Colon cancer is, unfortunately, not unusual in the United States. There are approximately 140,000 cases of colon cancer diagnosed each year. (Fahey, Vol. 1, p. 18) Occurrence of colon cancer in males under 30 however is extremely rare, being about .05% of the diagnosed population or about 700 cases per year. (Fahey, Vol. 1, p. 44) Expressed in ratio we may expect to see 30 cases of colon cancer per 100,000 males under thirty, per year. The total number of colon cancer deaths in males under 30 annually is 145. (Cole, Vol. II, p. 109) Dr. Balis in his original depositions erroneously calculated those numbers as 1 and 24 respectively.
Evaluation of medical information must encompass more than exposure to a known carcinogen. The human body, with its residual genetic weaknesses and differences, requires an accounting of other factors and information. Rubanick *495 presented a stage 4 colon cancer that already metastasized to another site in 1979. He had begun work at Witco in 1974. It is commonly accepted that colon cancers grow slowly and quietly, in an insidious manner, without necessarily manifesting outward symptomatology. It takes years, sometimes as long as a decade for original polyps to grow, become malignant and spread. (Fahey, Vol. I, p. 36). The medical probabilities then would make original onset after 1974 very unlikely. While Dr. Balis barely dealt with the issue of accepted periods of latency in colon cancer, he estimated a latency period between onset and stage 4 as a "year or two with many exceptions", but conceded he may be in error on the issue. (Balis, Vol. III, p. 23). In the context of events as they developed here such vagueness is not scientifically acceptable. More significantly the basis of Dr. Balis' expertise lies not in human treatment or diagnosis but rather in his survey of literature and research. He is barred by law from diagnosing and treating human beings. Notwithstanding numerous cross qualifications accepted by the courts, there is no reported decision permitting a non-physician to testify as to the condition or cause of human disease in any single clinical situation. Dr. Balis does not have the requisite expertise to offer an opinion as to causal relationship between Rubanick's cancer and his exposure to PCBs. It is not without significance that notwithstanding all the physicians who treated Mr. Rubanick, including Dr. Balis' colleague, Dr. Keminey, none were produced here to offer an opinion on causation.
3.) Has Dr. Balis offered a novel scientific opinion not generally accepted by the scientific community?
Whatever this Court, or any reviewing court, may decide about an individual witness' qualifications, the issue at the heart of this matter is whether there is sufficient evidence to support jury consideration of PCB exposure as a human carcinogen. Defendant asserts that there is no valid scientific evidence to establish PCBs, of any degree of chlorination, as *496 carcinogenic to humans. Dr. Balis in his testimony at Vol. III, p. 48, stresses that the premise is valid, based upon:
1.) A higher statistical incidence of cancer at Witco Chemical than would otherwise be anticipated.
2.) The conclusion to be drawn from animal studies on PCB ingestion.
3.) The results of a study published by Pier Alberto Bertazzi, M.D. and others, entitled "Cancer Mortality of Capacitor Manufacturing Workers", American Journal of Industrial Medicine 11:165 (1987).
4.) The variance of type of cancers occurring in a PCB exposed population.
In order to evaluate the proffered testimony the Court must review not only the testimony of the witnesses but the state of scientific knowledge regarding carcinogenicity of PCBs upon humans. This specific issue has not yet been addressed in any reported decision either in this State or the United States. That review must be discriminating because while there is no question that PCBs may be profoundly toxic to humans (PM-1) and have been known to cause skin disease, congenital birth defects, liver and restrictive lung disease, this case seeks to establish for the first time, a causal relationship between PCB exposure and human colon cancers. (PM-2)
PCBs are in fact 209 different chemical compounds with differing degrees of chlorination. Not all PCBs have the same properties and effects. (Vol. I, pp. 106-109) The extent of chlorination determines the physical and chemical properties of a particular compound. It is generally conceded that the degree of chlorination is in direct proportion to toxicity. PCBs are extremely stable compounds. They bind tightly to soil, do not move, and do not get into the air because they are not volatile. They are not soluble in water, immobile in the environment and do not readily degrade. (Vol. I, p. 137) PCBs are part of our modern environment even apart from their presence *497 in manufacturing uses. All humans have background blood levels of PCBs even absent specific concentrated exposure. (Vol. I, p. 138) Infants at birth show minimal PCB levels. (Vol. II, p. 54) PCBs are not flammable and do not conduct electrical current. Because of those particular qualities PCB fluids were highly desirable for use as insulators and heat exchange processes. They have been used particularly in gas transmission pipelines, electrical capacitors and transformers. (Vol. I, p. 108) Monsanto sold PCB fluids to Witco Chemical under the trade name Therminal beginning in 1969. Therminal is a product name for the PCB compound Arochlor. The product was designated by a number suffix indicating the percentage of chlorination. During the applicable period Monsanto shipped Arochlor 1242 and 1248 to Witco. Those products contained 42% and 48% chlorination respectively. Monsanto also manufactured Arochlor 1254 and 1260 but never sold any to Witco Chemical. Monsanto voluntarily discontinued the manufacture of PCBs prior to the 1976 Toxic Substances Control Act which limited PCB use to capacitors and transformers. (Vol. II, p. 55) It must be conceded, for purposes of this motion that the Witco Chemical plant still had a high degree of PCB contamination in the workplace at the time of exposure. (PM-3) That contamination was primarily in the earth.
We may assume, for purposes of this hearing that the decedent walked through the area, rolled 45 gallon drums of Witco product through the area and had direct skin contact with the contaminated areas. There is no credible evidence of any form of ingestion of PCB contaminated dirt. Inhalation would be negligible since PCBs are not volatile and do not readily get in the air.
Although not specifically relied upon by Dr. Balis in his testimony, plaintiff, by way of subsequent brief, urges this Court to take judicial notice, pursuant to Evid.R. 9, that PCBs are "harmful to our health" by reason of the adoption of the United States Congress of the 1972 Toxic Substances Control *498 Act, 15 U.S.C. 2601 et seq. That legislation empowered the U.S.E.P.A. to issue regulations concerning a broad range of toxic substances including PCB. Plaintiff's brief asserts that the EPA promulgated a regulation, 40 CFR 761.20, establishing certain PCB concentrations as constituting a human health hazard.
The proffer may be rejected out of hand on two grounds. Procedurally plaintiff did not introduce into evidence either the federal act or its ensuing regulation during the three day evidential hearing or request any reliance thereon. Substantively the offer is a non sequitur. As this opinion has earlier reflected it is conceded that PCBs may be profoundly toxic to humans. That is not the issue. Toxicity and carcinogenicity are not interchangeable terms. The issue here goes beyond general toxicity. The proffered statutory and regulatory evidence do not speak to the specific issue at hand and are therefore rejected.
While it is generally conceded that expert testimony is not always necessary in tort actions, Butler v. Acme Markets, 89 N.J. 270 (1982), there are times when expert testimony is absolutely essential to the requisite cause of action. Buckelew v. Grossbard, 87 N.J. 512 (1981). This is one of those cases.
Dr. Balis has here advanced a scientific theory never before accepted in any state or federal court in the United States. The mere fact, however, that the theory is novel does not make it inadmissible. At one time fingerprints, x-rays and blood typing were new. The question here, expressed in concrete pragmatic terms (useful for trial courts) is: What is the specific standard of proof and has plaintiff presented sufficient evidence to sustain that burden?
The most recent pronouncement on this issue by our Supreme Court arose in Windmere, Inc. v. International Ins. Co., 105 N.J. 373 (1987), where the continuing investigation into voiceprints received closer inspection. The Court said at p. 386:

*499 We note that our standard that a scientific technique have "sufficient scientific basis to produce uniform and reasonably reliable results and contribute materially to the ascertainment of truth",... is not a rejection of the rule announced in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). Rather, "general acceptance in the field to which [the technique] belongs," id at 1014, is a critical factor in finding that there is "sufficient scientific basis to produce uniform and reasonably reliable results".
The approval of Frye v. United States, supra is helpful. The United States Supreme Court in dealing with acceptance of novel scientific theories noted:
Just when a scientific principle or discovery crosses the line between stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

Id. at 1014; emphasis added.
Thus, in Frye the United States Supreme Court observed that the difference between "experimental" evidence and "demonstrable" evidence was the degree to which experimental results of scientific investigation may be replicated, verified and generally accepted by scientists in that particular field.
Significant here then is the deductive process as well as the deduction itself. State v. Hurd, 86 N.J. 525 (1981); State v. Cavallo, 88 N.J. 508 (1982).
What does the term "general acceptance" mean for a working trial court in evaluating real proofs? Certainly it does not mean absolute universal agreement or "total or absolute infallibility of the techniques, methodology or procedures that underlie the scientific evidence.... The fact that a possibility of error exists does not preclude a conclusion that a scientific device is reliable." Romano v. Kimmelman, 96 N.J. 66, 80 (1984). However, acceptance by a "substantial segment" of the relevant discipline must be shown. The Windmere Court noted that three ways generally are available by which "a proponent of expert testimony or scientific results can prove the required reliability in terms of its general acceptance within the professional *500 community: (1) the testimony of knowledgeable experts; (2) authoritative scientific literature; and (3) persuasive judicial decisions which acknowledge such general acceptance of expert testimony." Id., 105 N.J. at 379. See also Gianelli, "The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later", 80 Colum.L.Rev. 1197, 1215-1219 (1980). The Windmere Court's further discussion of the failure by the proponent of the evidence to demonstrate general acceptance by any of the three means is relevant to this case. There, the Court focused principally on the independence and the number of experts offered, the degree of corroboration provided by independent witnesses, and the extent to which consensus in the scientific community had been demonstrated by expert testimony or scientific literature. 105 N.J. at 379-385. With respect to expert testimony, the Court found that the uncorroborated opinions of two biased experts which revealed no consensus in the scientific community, but rather a "divided camp", was insufficient to establish general acceptance.
In the context of evidence adduced at the Rule 8 hearing, construction of the above principles must be carefully done and mindful of a jury's prerogative of deciding disputed issues of fact. In the instant case this Court interprets the requirement of "general acceptance" and "substantial segment" of the scientific community to mean that as a threshold requirement for admissibility an expert opinion must be based upon a scientific principle accepted by at least a substantial minority of the applicable scientific community. Logic and policy dictate such a construction. If admissibility (as opposed to jury fact finding) were limited only to majority scientific opinions then admissibility would be a simple issue of arithmetic. By opening jury consideration to expert opinions embraced by a substantial minority scientific acceptance, there will be a testing in the advocacy arena of new ideas without prejudicing a party opposing the disfavored or novel principle.
*501 Here, although Dr. Balis answered the questions framed by plaintiff's counsel on direct examination, his testimony as to acceptance of PCBs as human carcinogens is wholly lacking. The following edited colloquy with Dr. Balis is critical.
Q. * * * Is it your opinion that in general the majority of the scientific community accepts that thesis?
A. * * * I don't think the majority of the scientific community pays any attention to PCBs. * * * Those who worked on PCBs * * * thirteen say yes. * * *
Q. * * * Within the scientific community is there general or majority agreement by the scientists involved in the discipline that exposure to PCBs would probably cause colon cancer in humans?
A. Probably? That's very difficult. * * * when I was first approached by Mr. Russo * * * I heard a lot about PCBs and I thought that's a possibility, let me look into it. And I called a half dozen people and they said it's a damn good candidate but they're not saying probable. Surely they said it's a high possibility. (Vol. III, pp. 71-73)
Dr. Balis later agreed that he previously identified PCB carcinogenicity as a working hypothesis rather than an accepted principle. That would appear to be the current state of scientific knowledge and acceptance. The unrebutted testimony of Drs. Fahey, Cole and Harbison is that no recognized expert has accepted the scientific principle embraced by Dr. Balis much less a substantial minority of the applicable scientific community.
The position of Dr. Balis in this matter is similar to that of plaintiff's expert in Viterbo v. Dow Chemical Co., 826 F.2d 420 (5th Cir.1987). In that case the Court discussed the admissibility under F.Evid.R. 702 and 703 of an uncorroborated expert's opinion regarding the causal relationship between exposure to an herbicide and various symptoms experienced by the plaintiff, stating: "In this case today we consider the question whether it is so if an expert says it is so." Id. at 421. Concluding that the "expert brought to court little more than his credentials and a subjective opinion", the Court affirmed the decision of the district court to exclude the testimony. Id. In this connection, the Court observed: "If an opinion is fundamentally unsupported, then it offers no expert assistance to the *502 jury. Furthermore, its lack of reliable support may render it more prejudicial than probative. * * *" Id. at 422.
The second leg of the Windmere test is supportive scientific literature. Although Dr. Balis relied on thirteen studies with special reliance on the Bertazzi paper, supra his reliance is ill founded. Defendant's experts have testified that the papers do not say what plaintiff's expert concludes. The Court has independently reviewed those papers and arrives at the same conclusion without question. In short the bulk of those studies deal with ingested PCBs in rodent populations with varying degrees of chlorination, higher than that involved here. In some cases where PCBs with 54% chorination were administered (along with benzenehexachloride), liver cancers were observed. Lesser degrees of chlorination did not give rise to these results. In no cases did any test animals develop colon cancer. To make the quantum leap from laboratory animal non occurrence to human causality to a reasonable degree of medical certainty is not warranted or supportable.
Dr. Balis' reliance on animal studies to demonstrate human causation in this case is misplaced. Other courts have previously rejected animal studies as proof of causation. See e.g. Lynch v. Merrell-National Laboratories, 646 F. Supp. 856, 865-866 (D.Mass. 1986); In re Agent Orange Product Liability Litigation, 611 F. Supp. 1223, 1241 (D.C.N.Y. 1985) (animal studies are "of so little probative force and are so potentially misleading as to be inadmissible"); Viterbo, 826 F.2d at 424 (refusing to recognize as probative studies on rats using higher doses and demonstrating different effects.)
In regard to the human studies, especially the Bertazzi study, Dr. Balis' opinion is again misplaced. It was Balis' testimony that the variety of "weird" cancers reported there, as well as those found among Witco employees, constituted compelling proof of common origin in PCB exposure. (Vol. III, pp. 46-49) There is no corroborative scientific authority for such a conclusion.
*503 Dr. Balis' reliance on the Bertazzi paper is unwarranted since the study fails to demonstrate any significant increase in the incidence of colon cancer in PCB exposed populations. It is true that an increase in other cancers of the GI tract was observed. However, the authors themselves cautioned that no conclusion "regarding the association between cancer of the GI tract and exposure to PCB can be drawn from the results of the study." (Bertazzi (1987) at 172) Moreover, it was demonstrated by Dr. Cole and not disputed by Dr. Balis that the GI cancers observed by Bertazzi cannot be related to cancer of the colon. Dr. Balis' scientifically unacceptable statement that causal relationship to PCB exposure was best illustrated by the dissimilarity of resulting cancers, not their similarity, must be rejected.
Thus, Dr. Balis' opinions fail, having not been previously recognized by any recognized tribunal, having no substantial minority acceptance, and having no support in the scientific literature and must be barred from the trial of the cause.
In view of the Court's disposition on the above question it is not necessary to treat at length with defendant's assertion of an adequate factual basis for Dr. Balis' opinion. Suffice it to observe that plaintiff's expert glossed over too many significant issues: The source of contamination since it was not ingested as one would most probably expect, decedent's specific duties and location in relation to contaminated areas, the erroneous calculation of morbidity and mortality rates; decedent's health, diet and family history and other possible causative sources. He totally discounted the results of the NIOSH study at Witco after this event wherein blood serum PCB levels of Witco employees were within normal ranges. This, of course, becomes critical when it is realized that science has only identified about half of the causes of human cancers.
For all the above reasons defendant's application to bar the testimony of Dr. Balis is granted.