## CIRCUIT COURT OF THE CITY OF RICHMOND

Al F. Lee

v.

Richmond, Fredericksburg
and Potomac Railroad Co.

April 9, 1991

Case No. LS-3855-4

## By JUDGE RANDALL G. JOHNSON

This Federal Employers' Liability Act ("FELA")[1] case is before the court on defendant's motion to transfer venue and on plaintiff's motion to compel discovery. For the reasons which follow, defendant's motion to transfer venue will be denied, and plaintiff's motion to compel will be granted, with conditions.

### 1. *Venue*

The accident giving rise to plaintiff's claim occurred in October, 1988. Plaintiff, an employee of defendant Richmond, Fredericksburg and Potomac Railroad Company ("RF&P"), claims that he was injured while operating a crane at or near RF&P's Massaponax Yard in Spotsylvania County, Virginia. Citing the recent case of *Norfolk &*

---

[1] 45 U.S.C. sect. 51 et seq.

*Western Railway Company v. Williams*, 239 Va. 390, 389 S.E.2d 714 (1990), defendant asks that the case be transferred to the Circuit Court of Spotsylvania County under the doctrine of *forum non conveniens.*

*Williams*, also a FELA case, involved an accident which occurred at Norfolk and Western's offices in Roanoke, Virginia, where plaintiff was employed. Suit was filed in Portsmouth, Virginia. Norfolk and Western, citing *forum non conveniens*, moved to have the case transferred to Roanoke. The circuit court denied the request, and plaintiff was awarded $713,000.00 after a three-day jury trial in Portsmouth. On appeal, the Supreme Court agreed with plaintiff that "[v]enue statutes generally afford a plaintiff a choice of appropriate forums," that such choice "usually allows [the plaintiff] to choose a place which he considers most suitable," and that "the plaintiff's choice of forum is entitled to great deference." (239 Va. at 392 and 394). The Court went on to say, however, that the "presumption of correctness [which] attaches to a plaintiff's choice of forum . . . is not absolute." *Id.* at 394. The Court also rejected the plaintiff's argument that the presumption in favor of the plaintiff's choice of forum in a FELA action is stronger than in other actions and held that it was "bound to apply the same principles to venue issues in a FELA case as we apply to venue issues in any other tort case." *Id.* at 394. Applying general venue principles, the Court held that the trial court abused its discretion in refusing to transfer venue to Roanoke and reversed the judgment entered on the jury's verdict.

First, the Court noted the substantial inconvenience inflicted upon the witnesses, all but one of whom resided in Roanoke.[2] Next, the Court noted that only two factors existed which supported retention of the case in Portsmouth: (1) the fact that Norfolk and Western's tracks run through Portsmouth, requiring the company to engage in business in that city, and (2) that Portsmouth was plaintiff's original choice of forum and that such choice should not be lightly defeated. 239 Va. at 395. The Court stated:

[2] The one witness who was not from Roanoke was a physician located in Richmond, Virginia, who was selected by plaintiff's counsel.

But the weight afforded that choice is diminished when, as here, the action has at best only a technical, formal connection with the original court chosen, Portsmouth . . . . While Portsmouth was a proper forum, it had no practical nexus whatsoever with the instant action. *Id.* at 395-96 (citations omitted).

Finally, the Court set out those factors showing a "strong nexus" between the action and Roanoke and which required transfer of the case:

In contrast, this action has a strong nexus with Roanoke. The injury arose in Roanoke. N & W's registered agent and principal headquarters were located in Roanoke. All of the known potential witnesses, with the exception of one, were residents of Roanoke. The plaintiff was employed by N & W at an office in Roanoke. The trial court was presented with sufficient information to show good cause to transfer, including substantial inconvenience to the parties and witnesses, as well as indications of a forum originally selected for "not simply justice, but perhaps justice blended with some harassment." Reviewing the applicable principles and record available for consideration by the trial court, we conclude that the trial court abused its discretion in denying N & W's motion to transfer the action from the Circuit court of the City of Portsmouth to the Circuit Court of the City of Roanoke. *Id.* at 396 (citation and footnote omitted).

As previously noted, the Court reversed the $713,000.00 judgment entered on the jury's verdict and remanded the case for transfer and a new trial. I conclude that the holding of *Williams*, when applied to the facts of this case, do not warrant a transfer here.

It is true that the accident in this case occurred in Spotsylvania County, not Richmond. Unlike *Williams*, however, there is a much stronger nexus between the instant plaintiff's action and Richmond than there was between Mr. Williams's action and Portsmouth. In *Williams*, the

only legal basis for venue in Portsmouth was Norfolk and Western's doing business in Portsmouth because its track ran through that city, a nexus which the Supreme Court characterized as being "at best only a technical, formal connection . . . ." 239 at 395. Here, not only does RF&P do business in Richmond, its corporate headquarters and registered agent are located here. Just as natural persons voluntarily choose where they will live, corporations voluntarily choose where their corporate existence is based; that is, where *they* will "live." RF&P has chosen Richmond. Richmond is as much RF&P's residence as it is the residence of natural persons who live here. This is far more than the "technical, formal connection" referred to in *Williams*.

Next, the substantial inconvenience to the witnesses in *Williams* is not present here. Portsmouth is approximately 236 miles from Roanoke.[3] Witnesses travelling from Roanoke would likely have to spend the night in Portsmouth, thus "being away from families, houses and jobs." 239 Va. at 395. Such travel would also necessarily increase the cost of litigation.

Here, the Spotsylvania courthouse is just over fifty miles from Richmond. Moreover, RF&P has identified nine potential lay witnesses, six of whom live in Caroline County, two of whom live in Fredericksburg, and one of whom lives in Hanover County. Of the six witnesses who live in Caroline County, four live in Ruther Glen, almost precisely midway between Spotsylvania and Richmond, about 26 miles from each. The other two Caroline County witnesses, one from Bowling Green and one from Woodford, are only 19 miles (Bowling Green) and 29 miles (Woodford) closer to Spotsylvania than they are to Richmond. By no stretch of the imagination is this the substantial inconvenience frowned upon in *Williams*.

Similarly, the court also rejects RF&P's argument that it would substantially inconvenience the Fredericksburg witnesses to come to Richmond for depositions and/or trial, Fredericksburg being only 58 miles, about a one-hour drive,

---

[3] This distance and those set out below are taken from or calculated using the official state highway and transportation map issued by the Virginia Department of Transportation.

from Richmond. With regard to the Hanover County witness, he lives in Doswell, which is actually *closer* to Richmond than it is to the Spotsylvania courthouse.

In a related argument, RF&P asserts that it will suffer substantial inconvenience because if the case is transferred to Spotsylvania, its employee-witnesses can be scheduled for depositions and/or trial in such a way that they would not all have to be away from their jobs at the same time. At least with regard to depositions, such scheduling can also take place in Richmond without any considerable increase in the employees' time away from work or, if the parties agree, may be taken closer to the witnesses' worksite. *See* Va. Code § 8.01-420.4 and Rule 4:5(a1) of the Rules of the Supreme Court of Virginia. In any event, the court holds that requiring RF&P's witnesses to miss one or two days from work in a case with an *ad damnum* clause of $1,000,000.00 does not constitute substantial inconvenience.

RF&P next argues that it will be substantially inconvenient for it to depose the medical care providers, all of whom are in the Fredericksburg area, since "RF&P will either have to pay to bring the witnesses to Richmond for depositions or pay its counsel to travel to Fredericksburg." RF&P's Memorandum in Support, etc., at 3. Aside from the court's previous holding that 58 miles does not establish substantial inconvenience, RF&P's argument makes no sense. Whether or not the case is transferred to Spotsylvania, RF&P will *still* either have to pay to bring the witnesses to Richmond for depositions or pay its counsel to travel to Fredericksburg. RF&P has given absolutely no indication that it will replace its present counsel, both of whom practice in Richmond, with Spotsylvania or Fredericksburg counsel if the case is transferred, and the court believes it is sufficiently familiar with both RF&P and its present counsel to know that no such substitution would occur. While RF&P will have to pay to bring such witnesses to Richmond for trial, if it chooses to call them, a transfer would require RF&P to pay its counsel to travel to Spotsylvania for trial. While the court is unwilling to antagonize either its physician friends or its attorney friends by assuming which profession charges higher hourly rates, any difference in favor of physicians, *if* there is any, would not constitute substantial inconven-

ience. Indeed, if, as RF&P suggests, the trial of this case may take two days, RF&P will probably *save* money by paying physicians' travel time to Richmond for one day as opposed to paying their lawyers' travel time to Spotsylvania County for two days.

RF&P also suggests that transfer is appropriate if a view of the accident scene is necessary. RF&P states, however, that "it is too early in the case to determine whether a view of the crane and the accident site would be advantageous . . . ." RF&P's Memorandum at 4. While *Williams* does mention the "possibility of view of premises" as one of the factors a court should consider in deciding whether to transfer a case (239 Va. at 393), this court believes that more is required than a mere suggestion that at some future time a party *may* decide to request a view. Obviously, the burden of showing substantial inconvenience is on the party alleging it. RF&P has not shown, or even asserted, that a view is appropriate. Indeed, it says it does not know whether a view is appropriate or not. Under such circumstances, the mere "possibility" of a later request for a view is insufficient to warrant a transfer of venue.[4]

Finally, RF&P argues that a transfer is appropriate because plaintiff has filed this suit in Richmond "based on the belief that a Richmond jury is more likely to hold for a plaintiff and award him a substantial verdict." RF&P's Memorandum at 5. The court will not comment on that argument except to say that I disagree with RF&P's apparent perception that Richmond juries are more likely to return plaintiffs' verdicts and award "substantial" verdicts than juries elsewhere, and to hold that such perception on the part of a defendant is absolutely irrelevant in determining whether a case should be transferred under the doctrine of *forum non conveniens*. The court having considered the appropriate factors under *Williams*, RF&P's motion to transfer venue is denied.

---

[4] From the facts of the case as pleaded and as represented by counsel in their memoranda and oral argument, it is hard to believe that a view will be necessary. Plaintiff claims he was injured when a railroad crane derailed and its windshield struck him on the head. There is nothing in that scenario which indicates that a jury would be aided by a view of the scene or the crane.

## 2. *Motion to Compel*

Plaintiff's motion to compel involves a "surveillance" videotape apparently showing plaintiff engaged in some activity which he claims, or which RF&P believes he will claim, he is unable to perform as a result of the accident. Plaintiff's request for production includes a request for "[a]ny and all photographs, video tapes [*sic*], movies . . . or other documents in the possession of the defendant pertaining to plaintiff's accident of October 4, 1988, whether in regard to liability, damages or injuries." Request No. 5 of plaintiff's Request for Production served November 6, 1990. RF&P objects on the ground that its surveillance videotape of plaintiff is protected under the "work-product" doctrine of Rule 4:1(b)(3) of the Rules of the Supreme Court of Virginia.

The subject Rule provides, in pertinent part:

> [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this Rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

It is RF&P's position that its surveillance videotape, obviously prepared in anticipation of litigation and for trial, is not subject to discovery by plaintiff. First, RF&P argues that plaintiff has failed to show that he is "unable without undue hardship to obtain the substantial equivalent of the materials by other means"; and second, that to allow discovery of the videotape would enable plaintiff to "manufacture" an excuse for having engaged in the activity depicted ·or, to put it another way, to

"get out of the lie" which the videotape would otherwise expose.

While the position which RF&P takes has already been rejected by two judges of this court,[5] RF&P's position in this regard still finds considerable support from one of the other judges of this court. In *Smith v. National Railroad Passenger Corp.*, 22 Va. Cir. 348 (1991), the Honorable T. J. Markow held that the type of videotape at issue here is not discoverable by the plaintiff. In fact, not only did Judge Markow find that the plaintiff in that case had not shown a substantial necessity for the information sought, or that he could not obtain the substantial equivalent without undue hardship, he also held that it was inappropriate to allow such discovery since it might enable the plaintiff to embellish his injuries, or even commit perjury, in presenting his case to a jury. Specifically, Judge Markow stated:

> If the diligence and industry of [defendant] has revealed, through surveillance, evidence of exaggeration or outright lying on the part of [plaintiff], this court will not strip it of the advantage gained without a showing which will meet the requirements of the rule to overcome the protected status of the material. This court finds that any facts learned by the surveillance is within the plaintiff's knowledge[;] he has the substantial equivalent of anything that has been learned by the defendant and has it without undue hardship. The rule does not require that he have it in the same form as does his adversary. The Supreme Court of Virginia said plainly that "[w]here both parties have an equal opportunity to investigate and where all the witnesses to the accident are known and available to both sides, discovery should not be granted." *Rakes v. Fulcher*, 210 Va. 542, 756, 172 S.E.2d 751 (1970). The plaintiff has not borne the burden of overcoming the protection of the sur-

---

[5] See, Moore v. CSX Corporation, 22 Va. Cir 97 (1990) (Hughes, J.); and McIntyre v. CSX Transportation, Inc., 22 Va. Cir. 302 (1990) (Harris, J.).

veillance materials. *Smith v. National Railroad Passenger Corp., supra.*

In reaching his decision, Judge Markow cited the following language from Vice Chief Justice Struckmeyer's dissent in *Zimmerman v. Superior Court*, 402 P.2d 212, 219 (Ariz. 1965):

> The category of surveillance evidence . . . has two obvious attributes: First, it pertains to facts which come into existence after an accident occurs. As such, it has nothing to do with the merits of the plaintiff's right of action. Second, it almost invariably concerns facts which are better known to the plaintiff than to the defendant, facts which in all fairness should be known equally to both parties but which, because of their nature, often are impossible for the defendant to discover with certainty. It is therefore a fertile field for fraud and magnification, and a field in which the parties are not on even terms. Because of the strong public policy against perjury and because the parties are often not on even terms in the presentation of evidence of the exact extent of a plaintiff's injuries, a defendant should not be required to disclose the result of his surveillance. *See also, State v. McMillan*, 351 S.W.2d 22, 26 (Mo. 1961) ("[T]he discovery procedure has not been formulated for the benefit of a litigant who is already in possession of all of the facts . . . . Certainly plaintiff . . . knows all the material facts concerning her own injuries, any existing disabilities, and her activities.").

While the statements set out above are well-reasoned and logical and while I have the utmost respect and admiration for Judge Markow's analysis, I respectfully disagree with his holding.

With respect to whether plaintiff is able without undue hardship to obtain the information sought, it is true that if the videotape is of plaintiff, plaintiff

must now have, or at some time have had, knowledge of the activity in which he was engaged at the time the videotape was made. This, however, does not answer the question. All of us engage in hundreds of activities every day -- walking, sitting, stretching, kneeling, stooping, driving, eating -- the list goes on and on. The accident here occurred in October, 1988. To require plaintiff to guess which particular activity he was video-taped engaging in during that two and one-half year period would be requiring him to do something none of the rest of us could possibly do. Moreover, the Rule refers to a party's being unable to obtain "the substantial equivalent of the materials by other means." Without knowing what the materials are -- that is, what the videotape depicts -- it is impossible for plaintiff to obtain the "substantial equivalent" of the materials here.

In addition, even if plaintiff could somehow guess what RF&P's videotape shows, he still cannot obtain the "substantial equivalent." The videotape of plaintiff is unique; it had never been made before and it can never be made again. It shows plaintiff doing something at a time which will never recur. There is no "substantial equivalent" of that depiction. *See, e.g., Olszewski v. Howell,* 253 A.2d 77, 78 (Del. 1969) ("[E]ven assuming the plaintiff can recall the events of the two days in question, the precise evidence which the defendant has, the film, is now unique and cannot now be reproduced."); *Jenkins v. Rainner,* 350 A.2d 473, 477 (N.J. 1976) ("If the evidence is unique, such that a party cannot copy or otherwise recreate it, then the hardship in obtaining a substantial equivalent seems manifest. Defendants do not offer any suggestion as to what steps plaintiff might now take to reproduce the evidence contained in their motion pictures. The likelihood of any substitute, were we ale to think of one, being the substantial equivalent of films is slim indeed, given the tremendous impact of movies."). I conclude that plaintiff has met his burden of showing that he cannot obtain the substantial equivalent of RF&P's videotape here.

Turning now to the second prong of the analysis in *Smith,* I find two major problems with the holding that allowing discovery of surveillance tapes leads to embellish-ment, even to the extent of perjury, of plaintiffs' claims.

First, such holding is directly contrary to two of the primary purposes of our discovery rules: to prevent surprise and to facilitate an orderly and expeditious trial. While it is true that allowing defendants to keep their surveillance tapes secret until trial might discourage dishonest plaintiffs from "embellishing" their injuries, the same can be said of many other discovery matters. For example, allowing a defendant to keep secret until trial the report of a doctor who examines a plaintiff under Rule 4:10 might also discourage a dishonest plaintiff from alleging injuries that do not exist. So, too, would a rule allowing a defendant not to divulge the existence of photographs, expert witnesses, statements made by plaintiff, or almost any other potential item of evidence. The Rules, of course, require that all of these things be disclosed in response to proper discovery requests. I see no difference between that evidence and the evidence at issue here. Simply put, the Supreme Court has made a conscious decision, through the adoption of the rules of discovery, to remove surprise as an element of litigation in Virginia. In my opinion, the holding of *Smith* intrudes upon that decision.

Similarly, it is my opinion that the holding of *Smith* will cause unwanted and needless delay in the trial of cases where surveillance tapes are involved. *No* evidence, whether it is a photograph, letter, note, gun, or anything else, should ever be shown to a jury before it is shown to opposing counsel. There is certainly no reason to make an exception for surveillance tapes. That being the case, the trial will have to be stopped in order to allow plaintiff's counsel to see the tape and to make whatever objections he or she feels are appropriate. Moreover, if objections are sustained as to portions of the tape, the tape will have to be edited, at best a cumbersome procedure during trial. I believe that this process is better carried out prior to trial. Indeed, the parties may even agree that contested portions of the tape should be edited out, and there will be time to perform such editing. Waiting until trial to show the tape to plaintiff's counsel destroys such opportunities and will inevitably lead to delay.

The second major problem which I find with *Smith* is that it assumes, either consciously or subconsciously, that plaintiffs and/or their attorneys are inherently more dishonest than defendants and/or their attorneys.

While I am not so naive as to believe that some plaintiffs might not embellish their injuries to, or even across, the point of perjury, I am not convinced that some defendants might not "embellish" surveillance tapes to, or even across, the point or misrepresentation. As was said in *Snead v. American Export-Isbrandtsen Lines, Inc.,* 59 F.R.D. 148 (E.D. Pa. 1973):

> [T]he camera may be an instrument of deception. It can be misused. Distances may be minimized or exaggerated. Lighting, focal lengths, and camera angles all make a difference. Action may be slowed down or speeded up. The editing and splicing of films may change the chronology of events. An emergency situation may be made to appear commonplace. That which has occurred once can be described as an example of an event which recurs frequently. We are all familiar with Hollywood techniques which involve stuntmen and doubles. Thus, that which purports to be a means to each the truth may be distorted, misleading, and false. 59 F.R.D. at 150.

While I certainly attribute none of the conduct mentioned in *Snead* to RF&P or any other defendant who has appeared before me, I likewise refuse to attribute equivalent conduct to plaintiff-at-bar or any other plaintiff who has appeared before me. Because *Smith* appears to me to impose a different standard of inherent credibility on defendants than it does plaintiffs, I cannot adopt its holding.

Having determined that RF&P's objection to plaintiff's request for the surveillance tape cannot be sustained, two other matters must still be addressed. First, the preceding discussion assumes that RF&P intends to show its tape to the jury, either as substantive evidence or for impeachment. Only if the tape is to be used at trial does plaintiff have a "substantial need of the materials" as required by the Rule for disclosure.

Second, my conclusion that plaintiff should not be surprised by seeing the videotape for the first time at trial does not mean that RF&P must be totally deprived of whatever surprise value is in the tape. Several courts

which have addressed this issue have attempted to balance plaintiffs' right to pretrial disclosure of surveillance tapes with defendants' right to challenge claimed disabilities by requiring disclosure only after plaintiff has been deposed and otherwise subjected to discovery requests related to his or her injuries. *See, e.g., Jenkins v. Rainner, supra*, 350 A.2d at 478; *Martin v. Long Island Railroad Company*, 63 F.R.D. 53, 55 (E.D. N.Y. 1974); *Blyther v. Northern Lines, Inc.*, 61 F.R.D. 610, 611-12 (E.D. Pa. 1973); *Snead v. American Export-Isbrandtsen Lines, Inc., supra*, 59 F.R.D. at 151. In this way, the videotape may be used to show a plaintiff engaged in activity which he or she has claimed, under oath, has been affected by the injury, while still observing the discovery rules' prohibition against surprise at trial. I believe that such an approach is appropriate here. Accordingly, RF&P will not be required to produce the subject videotape in this case until thirty days prior to trial. This will preserve the "surprise factor" of the tape and still give plaintiff an opportunity to conduct any necessary follow-up discovery regarding the making of the tape, as well as allowing the parties to request appropriate court rulings pertaining to the tape without intruding upon the time set aside for trial.